IN THE MATTER OF THE APPEAL OF WILLIAM P. VERDON FROM AN ORDER ADJUDGING HIM GUILTY OF CONTEMPT OF THE HUDSON COUNTY COURT OF QUARTER SESSIONS.

Argued April 3, 1916—Decided May 20, 1916.

1. The power of the Court of Quarter Sessions to punish contempts of court is derived wholly from the common law, which has neither been altered nor enlarged by statute in this state.
2. In a summary proceeding for contempt there can be no trial and hence there can be no witnesses against the accused nor a contradiction of his oath by that of others. The proper procedure in such cases is to bring the defendant into court to answer such interrogatories as shall there be exhibited against him. If his answers to the interrogatories show that no contempt has been committed, the party is entitled to his discharge; but if the contempt be admitted, the court shall then proceed to pronounce such judgment as the circumstances may require.
3. The procedure, as laid down by the common law, for the punishment of contempts of court is a part of the substantive law and not a rule of practice.
4. Courts of law can no more at their will adopt the chancery proceeding respecting matters of contempt than they can in any other matters respecting which the two courts radically differ.

On appeal from a judgment of contempt of court.

This is an appeal under the provisions of the act of April 17th, 1884 (2 Comp. Stat., p. 1736), providing for the review by this court of summary convictions for contempt.

The appellant, William P. Verdon, was by the Hudson County Court of Quarter Sessions adjudged guilty of a contempt of that court by reason of certain newspaper publications and was sentenced to pay a fine of $250, and to serve a term of thirty days in the county jail.

The proceeding, which was instituted by the Court of Quarter Sessions, resulted in the issuance by it of a rule to show cause requiring William P. Verdon and others to show cause why they should not be adjudged guilty as of a contempt of the Court of Quarter Sessions of Hudson County.

At the hearing upon the return of this rule Verdon appeared by counsel, who moved the court to proceed against his client by the filing of interrogatories and not by the taking of testimony to try the question of contempt, citing the case of In re Gonzales, not at that time officially reported. The motion of Verdon's counsel was overruled and witnesses were called and examined by the assistant prosecutor over the objection of counsel for Verdon, who stated that his client stood mute as to any participation in such trial, excepting to say, "that we now offer to purge ourselves or to attempt to purge ourselves of contempt of court upon the exhibition to us of written interrogatories in accordance with the course of the common law," which offer was renewed when Verdon was called to the bar of the court for judgment. At no time were interrogatories exhibited to Verdon whose conviction of contempt rested wholly upon the testimony of witnesses. The present appeal challenges the legality of the conviction thus had.

Before Justices GARRISON, TRENCHARD and BLACK.

For the appellant, *Harlan Besson* and *Merrill Lane.*

For the state, *George T. Vickers.*

The opinion of the court was delivered by

GARRISON, J. The power of the Court of Quarter Sessions to punish contempts of court is derived wholly from the common law, which has been neither altered nor enlarged by statute in this state.

What the common law of England was at the time at which we derived it from the parent country is thus stated by Blackstone, who wrote at about that period: "If the contempt be committed in the face of the court the offender may be instantly apprehended and imprisoned at the discretion of the judges without any further proof or examination. But in matters that arise at a distance and of which the court cannot have so perfect a knowledge unless by the confession of the party

or the testimony of others, if the judges upon affidavit see sufficient ground to suspect that a contempt has been committed, they either make a rule on the suspected party to show cause why an attachment should not issue against him or in very flagrant instances of contempt the attachment issues in the first instance, as it also does if no sufficient cause be shown to discharge; and thereupon confirms and makes absolute the original rule. This process of attachment is merely intended to bring the party into court; and when there he must either stand committed or put to bail in order to answer upon oath to such interrogatories as shall be administered to him for the better information of the court with respect to the circumstances of the contempt. These interrogatories are in the nature of a charge or accusation and must by the course of the court be exhibited within the first four days and if any of the interrogatories are improper the defendant may refuse to answer it and move the court to have it struck out. If the party can clear himself upon oath he is discharged, but if perjured may be prosecuted for the perjury." Blackstone then alludes to the totally different procedure in courts of equity where, "after the party in contempt has answered the interrogatories, such his answer may be contradicted and disproved by affidavits of the adverse party, whereas," he continues, "in courts of law the admission of the party to purge himself by oath is more favorable to his liberty, though perhaps not less dangerous to his conscience; for, if he clears himself by his answers, the complaint is totally dismissed." This "method of examining the delinquent himself upon oath with regard to the contempt alleged" he concludes, "has by long and immemorial usage now become the law of the land." 4 Bl. Com. 287.

This accurately states the common law of England just prior to the American Revolution. That this immemorial usage underwent no change in its transplanting to the American states is shown by a decision of the Supreme Court of New York, while Kent was still Chief Justice. The court said: "The attachment by virtue of which he had been arrested, was nothing more than a process to bring him into court

to answer the interrogatories which upon the return of it were to be exhibited against him. This is necessary to be done in every case before the party can be convicted of a contempt. If the answers to the interrogatories show that no contempt has been committed, the party is entitled to his discharge; but if the contempt be admitted, the court proceed to pronounce such judgment as the circumstances of the case may require." *Jackson* v. *Smith,* 5 *Johns.* 115. To the same effect is the decision of all courts that proceed according to the course of the common law.

Before leaving the common law rule it may be well to advert to a matter that must occur to everyone who considers the subject, viz., the mildness, not to say ineffectiveness, of the manner in which contempts were dealt with in the law courts of England as compared with the severity of its criminal law in other respects. That this arose from any special sympathy with this particular offence is not to be thought of; on the contrary, of all criminal offences, this is probably the very one that the judges would have liked to punish in the most effective manner. The course pursued by the common law judges was evidently therefore not from choice but from compulsion and the nature and sources of such compulsion are not far to find. Contempt was a criminal offence and Magna Charta expressly forbade that any person should be tried for a criminal offence unless upon the indictment of the grand inquest. In the face of this prohibition there could be no trial by the court. The unwritten constitution of England likewise provided that no man could be compelled to give testimony against himself and it likewise prohibited one accused of crime from testifying in his own behalf. The net result of these fundamental restrictions was that in the summary proceeding for contempt there could be no trial and hence no witnesses, from which it followed that if the defendant was to be convicted in such summary proceeding it must be upon facts admitted by his own oath, the taking of which was justified upon the somewhat sophistical ground that the taking of such an oath by the defendant was not the giving of testimony, because if there was no trial there

could be no testimony, and hence the defendant was not a witness. For present purposes the significant feature of this common law procedure is that it excluded the idea of a trial of the accused either by witnesses against him or by the contradiction of his oath by that of others. As well stated by a recent writer, "The common law mode of proceeding in cases of contempt presents no question of fact to be tried by a jury. The defendant determines by his own answer, under oath, whether he is guilty of that which is charged against him as a contempt of court, and if he fails thereby to purge himself the court may at once impose the punishment." 6 *R. C. L.* 523. This procedure was obviously not a mere rule of convenience which the judges might follow or not as they saw fit; on the contrary, it was a stern and substantial necessity and hence a matter of substantive law.

In this state our earlier cases prior to the enactment of the statute permitting an appeal to this court uniformly recognize this common law rule by their references to it. *State* v. *Fisler,* 6 *N. J. L.* 305; *State* v. *Doty,* 32 *Id.* 403; *State* v. *Ackerson,* 25 *Id.* 209. There arose, however, no occasion for its formal restatement.

However, shortly after the passage of the act of 1884, the case *In re Cheesman,* 49 *N. J. L.* 115, was before this court, in which Mr. Justice Dixon, stating the procedure in contempt cases in the courts of law, concluded by saying, "the accused, on being brought in, should be either held to bail or committed to answer interrogatories; then that the interrogatories be exhibited and answered; and thereupon according as his answers confess or deny his guilt he should be punished or discharged." Cheesman, by affidavit, declared the truth of the charge against him before interrogatories were filed and they therefore were not filed, and this irregularity is condoned in the opinion upon the ground that "the appellant never intimated * * * that he was entitled to have an attachment issue or interrogatories filed." This opinion therefore accurately apprehends and states the common law rule that obtains in courts of law in this state. If it be said that this statement of the common law was *dictum,*

it was, nevertheless, the considerate deliverance of a learned judge fresh from a thorough examination of the matter of which he spoke.

Such was the state of our decisions when the case In re Gonzales was decided by this court, Mr. Justice Parker delivering the opinion (88 *N. J. L.* 536). In that case the answers made by Gonzales to interrogatories exhibited to him by the court were not accepted as conclusive because of a contradiction between such answers and certain testimony that had been taken by the court as the basis for the issuance of a writ of attachment. Gonzales was found guilty of contempt by the Hudson Oyer and in reversing this judgment Mr. Justice Parker said: "On the whole, therefore, we think that appellant fully and fairly purged himself of any contempt, legally implied in the interrogatories, and which was testified to by the grand jury clerk. If his denial was adequate it must be taken as true. We think, therefore, that the finding that the appellant was guilty of contempt necessarily, and from a reading of the decision of the Oyer we should say confessedly, was based on the allegations in the testimony of the grand jury clerk, which were contradicted by appellant, and in the face of such contradiction. But the court had no right to weigh the evidence, as has just been pointed out. If the contradiction was full and adequate the appellant was entitled to his discharge." This decision, which accords full common law force to the defendant's answer to the interrogatories, cannot be reconciled with the proposition that the court may withhold the filing of interrogatories, and, against the protest of the accused, proceed to convict him upon evidence that would have been both inadmissible and nugatory if the court were proceeding to exercise its summary jurisdiction in the legitimate way.

Such proposition is in effect an assertion of the right of the Quarter Sessions to try one accused of a criminal offence at special sessions without his consent, and as such is open to all of the constitutional objections pointed out by Mr. Justice Depue in *Edwards* v. *State,* 45 *N. J. L.* 419. In

fine, the repugnancy of the common law proceeding in contempt cases to our constitutional guaranties with respect to indictment by a grand jury and to trial by a petit jury is overcome solely by the existence of such arbitrary power as part of the common law which we have inherited, but this protection would not extend to a modern departure therefrom, that at the time of its adoption did violence to these sections of our bill of rights. Excepting it keep within its common law authority no court of law in this state can summarily convict and punish for a criminal contempt any more than it could convict and punish for any other criminal offence without indictment and trial by a petit jury. *Const. of N. J.*, *art.* 1, §§ 8, 9.

The unbroken line of decision by which the rule of the common law has been preserved and handed down to us coupled with the insurmountable constitutional objections to the radical departure therefrom essayed in the present case compel the reversal of the judgment now before us, unless such a result is obviated by any of the following considerations submitted in behalf of the state:

The first of these is that the common law procedure was a mere rule of practice and not one of substantive law. This has already been disposed of both upon historical and constitutional grounds.

The second is that the proceedings of courts of equity in matters of contempt being more efficacious than the procedure in courts of law should be adopted by the latter. This rests upon the same footing as would the contention that because specific performance was more efficacious than a judgment for damages, the courts of law should adopt the former remedy in preference to its own. The difference between courts of law and courts of equity is in nothing more marked than in their methods of remedial redress, which in courts of equity were administered from the earliest period largely, if not wholly, by the process of contempt. This resulted from the fact that equity acted only *in personam;* hence, if a personal decree were not obeyed the only remedy was by a process of

contempt to enforce obedience. Contempt was in fact in courts of equity what execution was in courts of law. Blackstone says, "The whole process of the courts of equity, in the several stages of a cause, and finally to enforce their decrees, was, 'til the introduction of sequestration, in the nature of a process of contempt." Such process of contempt being thus normally a part of the remedy afforded by a court of equity to its suitors, it naturally followed that the issues of fact involved in this phase of the suit were tried as any other issues of fact were tried.

Hence, there arose a practice unknown to the courts of law, which became by long usage inveterate in the courts of equity in which it subsisted side by side with the totally different practice that we have been discussing in the courts of law during the same period. This distinction has been pointed out by every writer and by every decision dealing with the subject.

The continued maintenance of this practice in courts of equity in dealing with contempts that are in their essence not remedial but criminal, trenches upon debatable ground on which we should not enter—*first,* because it in nowise concerns the question before us; and *secondly,* because it concerns matter respecting which *dictum* of any sort would be ill advised. Enough has been said to show that courts of law can no more at their will adopt the chancery proceeding respecting matters of contempt than they can in any other matters respecting which the two courts radically differ.

*Third* and lastly, it is said that there are decisions in other jurisdictions holding that the court may dispense with the exhibition of interrogatories or may treat the answers thereto as inconclusive.

Such of the decisions cited as I have examined were either equity cases, or decisions of courts in which law and equity were intermingled, or else arose under constitutional or statutory alterations of the common law. If, however, it were otherwise it would not affect the question in hand, since it is not our judicial habit to ignore decisions of our own courts

24    NEW JERSEY SUPREME COURT.

Pub. Serv. Ry. Co. v. Pub. Utility Com'rs.    *89 N. J. L.*

as to what the common law in this state is, in favor of the decisions of other states at variance therewith.

Finding nothing in the matters submitted for our consideration that in anywise militates against the conclusion we have reached, the judgment of the Hudson County Quarter Sessions convicting the appellant of contempt of court is reversed, and for nothing holden.