[Civil No. 3019. Filed October 6, 1931.]

[3 Pac. (2d) 522.]

In the Matter of the Application of LOUIE QUAN for a Writ of Habeas Corpus. CHARLES H. WRIGHT, Sheriff of Maricopa County, State of Arizona, Appellant, v. LOUIE QUAN, Appellee.

Mr. Terrence A. Carson, for Appellant.

No appearance for Appellee.

ROSS, J.—On his application for writ of *habeas corpus,* Louie Quan was discharged from the custody

of the sheriff of Maricopa county by an order of the superior court of such county, Honorable DUDLEY W. WINDES presiding, and the sheriff has appealed.

The facts, or those material, are as follows: In November, 1918, Louie Quan's wife, Mary, secured an absolute divorce from him, and at the same time was awarded the custody of their two minor children. In the decree the defendant was required to pay to the plaintiff a monthly sum for the support and maintenance of the children. Subsequently, this last order was modified by placing the children in the custody of St. Mary's school for children at Phoenix, Arizona, and directing the defendant to pay such school $40 per month for their support and maintenance. In November, 1929, upon application of the plaintiff and a showing therein that Louie had converted his property into money and sent it to China and had applied for passports for himself and two children, the court issued a writ of *ne exeat* prohibiting Louie from leaving the jurisdiction of the court unless he make a bond to the plaintiff conditioned to pay her all sums adjudged by the court for the support and maintenance of the minor children. Defendant executed the bond in the sum of $3,000, conditioned as provided above, and appealed from the court's order and decision.

Thereafter plaintiff made application to the superior court for an order requiring defendant to advance to her an attorney's fee and suit money with which to appear in the appellate court and contest the appeal. The court thereupon ordered defendant to pay to plaintiff the sum of $200 as an attorney's fee for that purpose.

On March 22, 1930, the plaintiff made a verified application for an order to commit the defendant for contempt in failing and refusing to pay plaintiff the said $200 for an attorney's fee, and the court thereupon issued a citation to show cause to defendant.

This citation was not served upon defendant, because the sheriff, after a thorough search, was unable to find him. It appears that at the time defendant was absent from the state, having gone to California on a visit. He later returned to the state.

On September 5, 1930, at a hearing before the Honorable M. T. PHELPS upon an application by plaintiff to have forfeited the *ne exeat* bond, the defendant being present and represented by counsel, the court, without hearing any evidence whatever, committed him to the county jail until such sum of $200 was paid or he was otherwise legally discharged.

The reason given by the court for ordering defendant discharged from the custody of the sheriff was that "no citation was had as required by statute."

As above stated, the court was considering the question of forfeiture of the so-called *ne exeat* bond at the time the contempt matter was taken up. The bondsmen had forcibly brought defendant into court for the purpose of surrendering him and securing release of liability on the bond. Defendant did not voluntarily appear. The court in substance said, addressing the defendant: "I made an order that you pay plaintiff $200.00 attorney's fees and you have not paid it. If you don't pay it right now, I'll commit you for contempt." The defendant verbally protesting that he had no means to pay the $200, the court imposed the sentence above stated.

The record fails to disclose that either the defendant or his attorney had ever been served with a copy of the rule to show cause. It affirmatively shows defendant was not served. The failure by defendant to pay the attorney's fee as directed by the court, if a contempt at all, was a constructive contempt, that is, one committed without the presence of the court. In such case the facts bring it within the procedure under section 4474 of the Revised Code of 1928. *Van Dyke* v. *Superior Court*, 24 Ariz. 508, 211 Pac. 576;

*In re Wright,* 36 Ariz. 8, 281 Pac. 944. That section, when this proceeding was had, read as follows:

"Contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, and contempts committed by the failure to obey any lawful writ, process, order, judgment of the court, and all other contempts not specifically embraced within this chapter may be punished in conformity to the practice and usage of the common law."

What is the common-law procedure, and was it followed in this case? are the questions to be determined.

In the investigation of the question as to what the common law is, we have found that in practically all of the states, as also in the United States, the procedure for contempt is prescribed by statute. Therefore most of the decisions, as well as the statements of the law by text-writers, are largely reflections of local statutes, not at all uniform. The practice and usage of the common law in contempt cases, at the time we derived it from the parent country, is stated by Blackstone as follows (we quote from *In re Verdon,* 89 N. J. L. 16, 97 Atl. 783):

" 'If the contempt be committed in the face of the court the offender may be instantly apprehended and imprisoned at the discretion of the judges without any further proof or examination. But in matters that arise at a distance and of which the court cannot have so perfect a knowledge unless by the confession of the party or the testimony of others, if the judges upon affidavit see sufficient ground to suspect that a contempt has been committed, they either make a rule on the suspected party to show cause why an attachment should not issue against him or in very flagrant instances of contempt the attachment issues in the first instance, as it also does if no sufficient cause be shown to discharge; and thereupon confirms and makes absolute the original rule. This process of attachment is merely intended to bring the party into court; and when there he must either stand committed or put to

bail in order to answer upon oath to such interrogatories as shall be administered to him, for the better information of the court with respect to the circumstances of the contempt. These interrogatories are in the nature of a charge or accusation, and must by the course of the court be exhibited within the first four days, and if any of the interrogatories are improper, the defendant may refuse to answer it, and move the court to have it struck out. If the party can clear himself upon oath he is discharged, but if perjured may be prosecuted for the perjury.'

"Blackstone then alludes to the totally different procedure in courts of equity where—

" 'After the party in contempt has answered the interrogatories such, his answer may be contradicted and disproved by affidavits of the adverse party, whereas,' he continues, 'in courts of law the admission of the party to purge himself by oath is more favorable to his liberty, though perhaps not less dangerous to his conscience; for, if he clears himself by his answers, the complaint is totally dismissed.' This 'method of examining the delinquent himself upon oath with regard to the contempt alleged,' he concludes, 'has by long and immemorial usage now become the law of the land.' 4 Bl. Com., p. 287.''

In the Verdon case it was further said:

"This accurately states the common law of England just prior to the American Revolution. That this immemorial usage underwent no change in its transplanting to the American States is shown by a decision of the Supreme Court of New York while Kent was still Chief Justice. The court said:

" 'The attachment, by virtue of which he had been arrested, was nothing more than a process to bring him into court, to answer the interrogatories which, upon the return of it, were to be exhibited against him. This is necessary to be done in every case, before a party can be convicted of a contempt. If the answers to the interrogatories show that no contempt has been committed, the party is entitled, . . . to his discharge; but if the contempt be admitted, the court proceed to pronounce such judgment as the cir-

cumstances of the case may require.' *Jackson* v. *Smith,* 5 Johns. (N. Y.) 117.

"To the same effect is the decision of all courts that proceed according to the course of the common law."

The Verdon case was reversed by the court of errors and appeals, *Hudson County Quarter Sessions* v. *Verdon,* 90 N. J. L. 494, 102 Atl. 66, on the ground that the court had failed to retry the case *de novo* as provided by local statute. It was said on the merits that there was "no settled practice" in that state requiring that contempts be heard "in accordance with the practice existing at common law," but the correctness of the rule at common law as stated in 89 N. J. L. 16, 97 Atl. 783, was not, and cannot be, questioned.

"The common-law mode of proceeding in cases of contempt presents no question of fact to be tried by a jury. The defendant determines by his own answer, under oath, whether he is guilty of that which is charged against him as a contempt of court, and if he fails thereby to purge himself the court may at once impose the punishment. . . . " 6 R. C. L. 523.

It is obvious that the common-law practice and usage required notice of the rule to show cause, except in a flagrant case when the contemnor might be brought before the court in the first instance by attachment and required to answer under oath interrogatories propounded to him. None of these requirements was observed in this case.

"At common law interrogatories must be filed in all cases of contempt except where the offense is admitted, and in some jurisdictions interrogatories are required by statute (Michigan and North Dakota), but this is not always the practice now followed." 13 C. J. 73, § 104.

An examination of the cases that have departed from the common-law rule requiring interrogatories

shows that they were generally influenced by some statute, or that the method of procedure pursued afforded the contemnor such ample opportunity to be heard that the departure was at most a mere irregularity and not prejudicial.

Our statute having adopted the common-law rule of procedure in contempt proceedings, we think it is the duty of the court to follow such procedure; yet a failure to do so, if without prejudice, is not sufficient ground upon which to reverse the case, in view of our constitutional provision to the effect that "no cause shall be reversed for technical error in pleading or proceedings when upon the whole case it shall appear that substantial justice has been done." Article 6, § 22.

See, also, sections 3741 and 5304 of the Revised Code of 1928.

If in other respects the defendant's rights were not disregarded, the omission to proceed by interrogatories, although irregular, was not so harmful as to require a reversal.

As we understand the law, it is absolutely essential that the contemnor be notified, either personally or through his attorneys, that a charge of contempt has been laid against him, and the nature thereof, and given an opportunity to be heard thereon before he may be punished therefor. In other words, he is entitled to his day in court. The author in 6 Ruling Case Law 532, section 45, after stating that this rule is mandatory in criminal cases, proceeds:

"In civil (contempt) cases, though the proceedings are not strictly of a criminal character, yet, inasmuch, as they are very similar, and their modes are summary and rigorous, the weight of authority, as well as the reason thereof, sustains the proposition that, where the contempt consists of the violation of an order made in a pending civil suit, the accused is entitled to a separate and distinct notice of the pro-

ceeding, either by information, which substantially states the facts, or by attachment serving a like purpose.''

This rule was not observed. As before stated, neither the defendant nor his attorney, so far as the record shows, had any notice of the rule to show cause.

If, however, one appears and defends against contempt proceedings, it is not required that he be served with notice to show cause. 6 R. C. L. 533, § 45; 13 C. J. 72, § 101. But we take it that such appearance and defense must be voluntary. If the defendant be forcibly brought into court for one purpose, it cannot be said he voluntarily appeared for that or any other purpose. And neither can it be said he defended the charge when the only thing he did was to sit mute, except when questioned by the court.

But it may be said he was represented by counsel; that, if he wanted to defend, he might have secured time therefor by requesting it; and that, not having done so, he is in no position to complain. In the first place, it is not certain that such a request would have been granted; and, in the second place, we think a party charged with an offense punishable by fine or imprisonment is entitled, as a matter of right and not of grace, to a reasonable time to prepare his defense.

We think it would be a dangerous precedent to hold the defendant here was given the opportunity the law contemplates to prepare and present his defense.

The order discharging the defendant from custody is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.