OF

## THE STATE OF NEW JERSEY.

## 1917-1918.

EDWIN ·ROBERT WALKER, ORDINARY.

FREDERIC W. STEVENS, EUGENE STEVENSON, EDMUND B. LEAM-
ING, VIVIAN M. LEWIS, JOHN H. BACKES, JOHN
GRIFFIN, JOHN E. FOSTER AND MERRITT
LANE, VICE-ORDINARIES.

In the matter of VICTOR MERRILL, charged with contempt of
court.

[Decided August 31st, 1917.]

1. It is a grave contempt of court to communicate with, or to seek in
any way to influence a judge, upon the subject-matter of a cause pending
before him and undecided, as such conduct is plainly an attempt to im-
properly influence the due administration of justice.

2. It is a contempt of the dignity of the court for one of the litigants
before it to denounce and abuse to the judge the lawyers representing
an adversary party, because lawyers are officers of the court.

261

3. It is a contempt of the dignity of an appellate court for one of the litigants before it to denounce and abuse the court below to an appellate judge, although the judge of the court below, in his judicial capacity, is not an officer of the court above.

4. Statements in a letter sent privately to the judge of a court before which an action is pending, containing statements impeaching the character of a witness who has testified in the cause in open court—where such impeachment may only be lawfully made—is a contempt of court.

5. While contempts are generally considered as being against the *power, authority and dignity of the court,* the contempt is also against the *integrity* of the court where the offer of a bribe is made to a judge.

6. Contempts are of two sorts, civil and criminal; the former is remedial, that is, a step in the cause for the coercion of one party for the benefit of another; criminal contempts are offenses against society, and, although they may arise in the course of private litigation, are not part thereof.

7. The court in which contumacious conduct is enacted has authority to institute and carry through a proceeding for the purpose of punishing the contemnor.

8. When the proceeding is of a criminal nature, it may be instituted by the court of its own motion and heard in a summary way; it is not a motion in the cause or a step in the private litigation in which it arises, and, *semble*, it should not be framed and treated as a part of the civil cause.

9. All superior courts of record, civil and criminal, possess inherently and independent of statutory authority, the power to punish for contempt.

10. Probate courts, to which class the prerogative court belongs are not technically courts of record; the prerogative court exercises the jurisdiction of an ecclesiastical court, and ecclesiastical courts are not courts of record.

11. There are exceptions to the rule that only superior courts of record have power to punish for contempt, and the prerogative court is one of the exceptions.

12. The power and authority of the prerogative court of New Jersey to punish for contempt as the inheritor of certain jurisdiction of its prototype—an English ecclesiastical court—examined and stated.

13. The jurisdiction of the prerogative court of New Jersey prior to the act of 1795 (*Pat. L. 1795 p. 153 § 18*) did not include power to fine or imprison a contemnor; by section 18 of that act, now section 82 (*Comp. Stat. p. 1724*), the prerogative court is clothed with power to fine and imprison for contempt.

14. In the construction of statutes the intention of the legislature is to be derived from a view of the whole act; the real intention, when ascertained, will prevail over the literal sense of terms; and when words are not explicit the intention is to be collected from the context and the occasion and necessity of the law and from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant to reason and good discretion.

15. The rule that penal statutes must be strictly construed does not mean that they should be subjected to any strained or unnatural construction in order to work exemption from their penalties; such statutes are to be interpreted by the aid of all the ordinary rules for the construction of statutes, and with the cardinal object of ascertaining the intention of the legislature.

16. Contempts are not only civil or criminal, but are also either direct, which openly insult or resist the power of the courts, or the persons of the judges, or are consequential, which, without such gross insolence, and direct opposition, plainly tend to create a universal disregard of their authority.

17. Direct contempts are those usually referred to as contempts in the face of the court (*in facie curiæ*), but this does not mean that such contempts must be committed while the judge is presiding in open session in the court room; it may be a contemptuous interference with judicial proceedings in which the judge is acting as a judicial officer.

18. *Semble:* That in a case of criminal contempt in the prerogative court, unexceptional procedure requires that order be made upon the contemnor to show cause why he should not be attached, when, if the writ be issued, interrogatories must be propounded.

19. *Semble:* That the answers of a respondent to those interrogatories would not have to be accepted as true.

20. The contempt in the case at bar being one *in facie curiæ* does not fall within the provisions of the act concerning contempt of court. *P. L. 1917 p. 71.* *Quære:* Does the act apply to the prerogative court?

WALKER, ORDINARY.

Probate having been denied by the Middlesex county orphans court of a paper-writing purporting to be the last will and testament of Mary Van Orden Parker, deceased, an appeal was taken to the prerogative court from the decree denying such probate, by Victor Merrill, the executor and residuary legatee named in the alleged will, and such proceedings were thereupon had in the prerogative court that the cause on appeal came on to be heard before the ordinary, at the state house, in Trenton, on Tuesday, July 10th, 1917, and was argued by Winfield S. Angleman, Esq., of counsel for appellant, Victor Merrill, and by Roger Hinds, Esq., and by Edward F. Clark, Esq. (of the New York bar), of counsel for the respondents, on the transcript of proceedings and evidence and exhibits sent up to the prerogative court by the Middlesex county orphans court, the ordinary reserving decision of the question submitted.

After such submission, and on July 12th, 1917, a letter bearing that date, addressed to "Honorable E. R. Walker, Trenton, N. J.," and post-marked New York, July 12th, seven P. M. (1917), with proper postage stamps thereon, was received by the ordinary, in due course of mail, at his chambers, in the city of Trenton, on the morning of July 13th, 1917, the body of which letter is in typewriting, but which letter is signed in manuscript and certain interlineations in the body thereof are also in manuscript, and, by comparison by the ordinary of the signature of Victor Merrill to the letter, and also the handwriting thereon, with documents admitted in evidence on the trial of the application for probate in the Middlesex county orphans court, and sent up with the transcript and testimony, which were proved to be the handwriting of Victor Merrill, it appears that the letter so mailed to, and received by, the ordinary, was signed by Victor Merrill in his own proper handwriting, and is his letter, a true copy of which is as follows:

"July 12th, 1917.

*"Honorable E. R. Walker,*

*"Trenton, N. J.*

"MOST HONORABLE SIR—I hope and pray that you will pardon the step I have taken in obeying the irresistible impulse of my aching heart in its clamor for justice to send you these papers which are intended solely for your own private information only.

"It is not the gain of the money which legally and morally belongs to me which I am after nor its loss which hurts me; but it is the vindication of my character, the assurance of the right interpretation of my pure motives toward this testatrix whom I highly esteemed and respected that I seek and which have been so ruthlessly transformed into a conspiracy by these unscrupolus lawyers, in order to received the 50% which the grandson has agreed to give them in case of success.

"As a proof to this, I am willing to sign any agreement, that if the will of Mary Van Orden Parker is probated, after my lawyers and other expenses are paid. I will turn over every dollar to any church, to any charitable, or benevolent institution that your honor, or any one selected by you may direct. Not one penny do I want out of it. Certain prominent men and politicians of Perth Amboy, Elizabeth and Metuchen have been so incensed by the conduct of these lawyers in their endeavor to break this will at any cost, and the attitude of the Judge in allowing such a mass of irrelevant evidence, all tending to confuse and obscure the real issue. Their attention was so especially called to the judges peculiar action when he actually declared to a Mrs. Schuenck (when on the witness stand) that he wanted to break the will, and asked her to go home and make up some story to help him in breaking it. (You will

find in the record this astounding fact), that they decided to assign a man to attend to every session of the trial and keep a strict record of the case: This man's report resulted in the formation of a complaint of 54 legal size typewritten pages of very interesting reading, which they intend to place before the legislature. A copy of which was sent to me for my signature, which I still have unsigned, and if you so desire to look it up, I will mail it to you at any address that you may suggest. In this complaint, Judge Daly is charged specifically, with espousing the contestants side, and showing malice and prejudice against the proponent. Then with a violation of all rules of law and evidence, etc., they make a heavy stress on the fact that he kept his decision pending for 6 months, and that when he finally did file his conclusion they declared, that it was neither more or less than a mass of self contradiction on the face of it. Making the testatrix sane at one time and insane at another. A criminal evasion of the real issue, distortion of facts, and in many instances actual falsehoods. Then the fact that the judge has annexed the contestant's brief to his conclusion, and made it a part thereof, is too significant of either knavery or idiocy, to require much explanation, although they do explain it to a considerable extent My lawyer, Mr. Angleman, thought that this woman Passage was only indicted when the truth is that she was convicted four times. Once for assault and battery on her own mother, for which she served almost two years, twice for soliciting and disorderly conduct, serving 6 months on the Island under the name of Jennie Le Claire. And then convicted again for larceny and receiving stolen goods. This is her record as far as the detective which we have assigned to look her up could find. But in her hometown the Reverend Mr. Mortin declared to the detective that she is a degenerate of a type that would baffle the criminologist under what heading she could be properly classified. She is looked upon in her town as a contamination to other girls, and that she will be arrested at sight if she is found there, as her carnal inclinations are bestial and unprintable, that she is a thief by nature, and truth and veracity are absolutely unknown virtues to her, and that even her own mother could not have her in the house.

"Begging your forgiveness for this liberty,

"I have the honor Honorable Sir of being your most humble servant,

"the proponent,

"Victor Merrill,
"Plainfield, N. J.

"P. S.   unfortunately that the day that this woman Passage was placed on the stand I was home sick, and my lawyers knew nothing of her, and this event was planned by the contestant's lawyer, as they had her in Klien's Hotel in New Brunswick."

In thus communicating privately to the ordinary concerning the cause on appeal after the same was submitted to the ordinary, and while it remained pending before him undecided, Victor Merrill, the proponent of Mrs. Mary Van Orden Parker's will

for probate, has attempted to improperly influence the due administration of justice in the cause, for which, in the opinion of the ordinary, he should be charged with contempt of the power, authority, dignity and integrity of the prerogative court, and be required to answer the charge. On its face the contempt appears to be plain, and the question arises, Has the prerogative court power to punish for contempt, and, if so, what is the method of procedure?

However, before taking up those questions, it will not be amiss to make some general analysis of Merrill's letter and show why and to what extent it is a contempt.

Merrill's offer to sign an agreement that if the will of Mary Van Orden Parker is probated, after his lawyers and other expenses are paid, he will turn over every dollar to any church, charitable or benevolent institution that the ordinary, or anyone selected by him, may direct, is in effect and in terms an offer to bribe the ordinary; not with personal gain for him, it is true, but, indirectly, by offering to donate the avails of the litigation to his nominee.

The assertion that certain prominent men and politicians have been incensed by the conduct of the lawyers for Mrs. Parker's heirs in their endeavor to defeat the will, and the charge against them of a conspiracy in order to receive a percentage which the testatrix's grandson, it is alleged, has agreed to give them in case of success, is a contempt. It is a contempt of the dignity of the court for one of the litigants before it to denounce and abuse to the judge the lawyers representing the adversary party, because lawyers are officers of the court.

The abuse heaped upon Judge Daly in the letter is also a contempt of the dignity of the court, although Judge Daly, in his capacity of judge of the orphans court of Middlesex county, is not an officer of the prerogative court.

Statements in the letter going to impeach the witness Passage are also a contempt. It is, of course, an impertinence and contempt for anyone secretly to endeavor to disparage and impeach the reputation of a witness who has testified in open court. The time and place for such impeachment is in the court on the trial. In passing I perhaps should remark that very little, if anything,

said against the Passage woman in the letter would be competent evidence to impeach her. Only convictions, not indictments, for crime can be given in evidence to impeach a witness, and, also, evidence that in the community in which she lives her general reputation for truth and veracity is bad. I ought, perhaps, to state that Merrill enclosed to me a copy of an indictment, but not a conviction, of the Passage woman.

On the question of contempt, while the cases generally refer to contempts as against the *power, authority and dignity* of the court, I am persuaded to add another term, namely, the *integrity* of the court, where, as in this case, the contempt includes the offer of a bribe—for surely a man who would offer to bribe a judge, not only contemns his dignity, but has as little respect for his integrity.

Contempts are of two sorts—civil and criminal. The former is remedial—that is, a step in the cause for the coercion of one party for the benefit of another. Criminal contempts are offences against society, and, although they may arise in the course of private litigation, are not part thereof. The court in which contumacious conduct is enacted has authority to institute and carry through a proceeding for the purpose of punishing the contemnor. The proceeding is of a criminal nature and may be instituted by the court of its own motion and heard in a summary way. It is not a motion in the cause or a step in the private litigation in which it arises, and it seems that it should not be framed and treated as a part of the civil cause. *Staley* v. *South Jersey Realty Co., 83 N. J. Eq. 300.* See also; *Gompers* v. *Buck's Stove and Range Co., 221 U. S. 418; 55 L. Ed. 797; 807.*

The court of chancery has jurisdiction to investigate an alleged attempt to improperly influence the due administration of justice in a case pending before it and to punish the offender if proved guilty. *Seastream* v. *New Jersey Exhibition Co., 72 N. J. Eq. 377, 379.* All superior courts of record, civil and criminal, possess this power inherently and independent of statutory authority. *In re Kerrigan, 33 N. J. Law 344; Rhinehart* v. *Lance, 43 N. J. Law 311, 313.*

Probate courts, to which class our prerogative court belongs, are not technically courts of record. It exercises the jurisdiction

of an ecclesiastical court. And ecclesiastical courts are not courts of record. *2 Bac. Ab. 625.* Of course, the prerogative court keeps records, but the mere fact that a permanent record is kept does not, in law, make the court technically one of record. The Prerogative Court act provides that transcripts of any will or. testament registered or recorded in the prerogative office, duly certified by the register, shall be received in evidence. *Comp. Stat. p. 1723 § 83.*

There are exceptions to the rule that only superior courts of record have power to punish for contempt. A court of admiralty is not a court of record, and yet it has power to punish for contempt. *Rhinehart* v. *Lance, supra* (at *p. 313*); citing *Spraks* v. *Martyn, 1 Vent. 1.*

The question recurs, Has the prerogative court of New Jersey power to punish for contempt? The answer involves an examination of the institution, power and authority of the court. And that examination will show that, being the inheritor of the jurisdiction of an ecclesiastical court, it, like those courts, has the power.

Lord Cornbury, in his commission as the first royal governor of the province of New Jersey (1702), emanating from Queen Anne (*2 N. J. Arch. (1st series) 489, 495*), *inter alia,* had granted unto him

"full Power and Authority with the Advice and Consent of Our said Councill to Erect, Constitute and Establish such and so many Courts of Judicature and public Justice, within Our said Province under your Government, as you and they shall think fitt and necessary for the hearing and determining of all Causes as well Criminal as Civil, according to Law & Equity, and for awarding of Execution thereupon, with all reasonable and necessary Powers, Authorities, Fees and priviledges belonging unto them."

In pursuance of this authority Lord Cornbury, by ordinance, or rather ordinances, instituted and established the court of chancery, the supreme and other courts, but no ordinance ever was promulgated establishing the prerogative court. That tribunal was instituted in this wise: In the instructions from Queen Anne to Lord Cornbury, as governor of New Jersey (*2 N. J. Arch. (1st series) 529 § 75*), it is laid down:

"And to the end the ecclesiastical jurisdiction of the said lord bishop of London, may take place in our said province so far as conveniently may be, we do think fit that you give all countenance and encouragement to the exercise of the same, excepting only the collating to benefices, granting licenses for marriages, and probate of wills, which we have reserved to you our governor and the commander in chief of our said province for the time being."

See, also, *Coursen's Case, 4 N. J. Eq. 411; Harris* v. *Vander-veer's Executors, 21 N. J. Eq. 435.*

In explanation of the ordinary's jurisdiction, Mr. Griffith, in his Law Register (*Griff. L. R. (N. J.) 1185 note 1*), says:

"The authority of the *Ordinary* shall extend only, to the granting of probate of wills; letters of administration; letters of guardianship, and to the hearing and finally determining of all disputes that may arise thereon. (*Rev. L. 776, s. 1.*)

"And nothing in this act shall prevent the ordinary in *person* from granting probates of wills, letters of administration, and letters of guardianship from the prerogative office, in cases where a convenience will arise from doing the same. (*Rev. L. 784, s. 27.*)"

The first constitution of New Jersey (1776) provided, in article 8, that the governor be the ordinary and surrogate-general, and the present constitution (1844), which divorced the office of chancellor from that of governor, provides, in article 6, section 4, paragraph 2, that the chancellor shall be the ordinary or surrogate-general and judge of the prerogative court. Thus, it appears that neither constitution in anywise created or limited the jurisdiction of the prerogative court. Its powers were those of the bishop of London, which were devolved upon Lord Cornbury in his instructions above mentioned, and sundry acts of the legislature passed before the adoption of the constitution of 1844, since which date the legislature has been powerless to curtail the court's jurisdiction. *Flanigan* v. *Guggenheim Smelting Co., 63 N. J. Law 647; In re Thompson, 85 N. J. Eq. 221, 236.* Nor has it attempted to do so.

It is pertinent here to inquire as to what power, if any, was possessed by the prerogative court in England to punish contemptuous persons. It is to be borne in mind that the functions of the prerogative court are, in their nature, those of an ecclesiastical court, from which they were inherited. Ecclesias-

tical courts punished offenders by excommunication. *2 Phil. Eccl. L. 1400.* The proceeding in England was this: A person who remained forty days under sentence of excommunication was, at the request of his diocesan, arrested and imprisoned on a writ *de excommunicato capiendo.* This writ issued out of the court of chancery upon a certificate, called a *significavit,* from such diocesan, under his Episcopal seal, signifying to the court of chancery the contempt of the party. This was a common law proceeding. *Ibid. 1404.* And this was the law of the ecclesiastical courts of England at the time of the institution of the prerogative court in New Jersey under Lord Cornbury, and it continued to be the law of England until after the separation of New Jersey from the mother country.

An act was passed by the British parliament in 1813 (*53 Geo. III. c. 127; 5 Stat. United King. 297*), which, in a preamble, recited that it was expedient that excommunication, together with all proceedings following thereupon, should, except in certain cases, be discontinued, and other proceedings substituted therefor, and enacted, *inter alia,* that when any person neglected or refused to pay obedience to the lawful orders or decrees of any ecclesiastical court, *or when any person committed contempt in the face of such court,* no sentence of excommunication should be pronounced (except in the particular cases specified), but, instead, it should be lawful for the judge whose order or decree should not have been obeyed, or before whom such contempt should have been committed, to pronounce such person in contempt and signify the same unto the chancellor, as theretofore done in excommunications, and thereupon a writ *de contumace capiendo* should issue from the court of chancery, which would have the same force and effect as the former writ *de excommunicato capiendo,* whereupon certain proceedings should be had, &c. Thus, it appears that the proceeding whereby a contemnor of the power, authority and dignity of the prerogative court of this state would be punished, in addition to excommunication, would be in the court of chancery upon a certificate of the ordinary, if, in fact, such a proceeding was ever prosecuted in this state; and, whether so or not, is there now some other lawful proceeding for the infliction of such punishment, and, if so, what?

Before proceeding to this inquiry I desire to say in passing that the act of *53 Geo. III.* is adverted to only for the purpose of showing that the British parliament recognized the law of contempt of an ecclesiastical court *in facie curiæ*, and that it was punishable in that court by excommunication, and further, as we have seen, in the court of chancery (if certified to that tribunal), where fine or imprisonment, or both, might be inflicted.

In *Phil. Eccl. L. 1263*, is given a form of *significavit* to the chancellor which, omitting the address, recites that

"        , having been duly pronounced guilty of manifest contumacy and contempt of the law and jurisdiction ecclesiastical in not appearing before            (or 'in not obeying the lawful commands of          ') (or 'having        committed a contempt in the face of the court of        , lawfully authorized by          ,'), on a day and hour now long past, in a certain cause," &c.

Thus, we see that the *significavit* was predicated upon a judgment of guilty of contempt. It concluded with an entreaty that the king would command that the offender be taken and imprisoned for his contumacy.

It is unnecessary to mention any of the pains and disabilities incident to excommunication; suffice it to say that they do not extend to imprisonment, that penalty being visited by the court of chancery, formerly by writ *de excommunicato capiendo* and now by writ *de contumace capiendo*.

It was this state of the law—that is, the inability of our prerogative court to imprison the contemnor, doubtless, that moved our legislature to clothe the prerogative court with the power to enforce its sentences and decrees by imprisonment.

The inadequacy of the jurisdiction of the prerogative court to enforce its sentences engrossed the attention of the law-making power as early as 1795, and in an act concerning executors and the administration and distribution of intestate's estates (*Pat. L. 153 § 18*), we find it provided that if any person shall neglect or refuse to obey any citation or to perform any sentence or decree of the ordinary or judge of the prerogative court, it shall be lawful for him to cause such person, by process directed to any sheriff, to be taken and imprisoned until he shall obey. This statute was re-enacted in the Revision of 1821, page 179, sec-

tion 18. In 1846, it was transferred to the act respecting the prerogative court and the power and authority of the ordinary. *Rev. 1846 p. 203 § 8.* This was doubtless because the constitution of 1844 was then in force, which provides in article 4, section 7, paragraph 4, that every law shall embrace but one object and that shall be expressed in the title. It is obvious that under this limitation the powers of the prerogative court could be bestowed only in an act respecting that tribunal. This section of the Prerogative Court act is still in existence, and is now to be found in *Comp. Stat. p. 1723 § 82.* This section was, undoubtedly, intended to clothe the prerogative court with power to enforce all of its sentences or decrees by imprisonment, including those adjudicating contumelious persons in contempt of court. The section is not happily phrased with respect to contempts, as they are not mentioned in terms. It would have been more perspicuous had it provided that if any person shall neglect or refuse to obey any citation or perform any sentence or decree, or be guilty of a contempt, of the prerogative court, he may be imprisoned, &c. And yet that is what is actually said with reference to disobedience of citations, sentences or decrees, and impliedly said with reference to contempts, for, if a person should refuse to obey a decree of the ordinary which he was able to perform, such person could be imprisoned for such disobedience, as for a contempt. It would be a consequential and not a direct contempt. The section would also reach a direct contempt, for it is absurd to suppose that the legislature would provide that the prerogative court could imprison for an indirect or consequential contempt, but could not inflict that penalty for a contempt *in facie curiæ.* The rules for the construction of statutes to my mind conclusively come in aid of this theory. The following authorities are apposite:

In *McGregor* v. *Home Insurance Co., 33 N. J. Eq. 181, 187,* it was held that the language within the intention of the makers of a statute is as much within the act as if it were within its letter.

In *Holt* v. *Akarman, 84 N. J. Law 371,* it was held (at *p. 378*):

"It is not to be presumed that the legislature ever intended to exempt a promise made by a bankrupt to pay a debt before his

discharge, even though such promise be made in writing, from the general interdictory ban of the statute prohibiting any action being brought against any person who may have been discharged as a bankrupt under the laws of the United States upon any promise made after such discharge to pay any debt or demand from which he was or shall be released by such discharge, unless such promise be put in writing, &c.    It was fairly within the contemplation of the legislature to include within the prohibitory terms of the act that any promise made by the bankrupt between the filing of the petition and the granting of the discharge, without regard to whether such promise was in writing or not, should be ineffectual."

Where the language of an act is general, the intention of the lawmaker may be ascertained with peculiar propriety from the effects of the statute. *Schroder* v. *Ehlers, 31 N. J. Law 44, 50.* If a case is not within the letter of an act, yet if on equitable construction it can be brought within the spirit and intention and within the mischief which the act was intended to remedy, such should be adopted. *Hoguet* v. *Wallace, 28 N. J. Law 523, 526.*

It is an established rule in the exposition of statutes that the intention of the legislature is to be derived from a view of the whole and of every part of the statute, taken and compared together.    The real intention, when ascertained, will prevail over the literal sense of terms.    When words are not explicit the intention is to be collected from the context and the occasion and necessity of the law and from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant to reason and good discretion.    *Morris Canal, &c.,* v. *Central Railroad Co., 16 N. J. Eq. 419,* per Wilson, master, citing Chancellor Kent (at *p. 428*).

In *State* v. *Clark, 29 N. J. Law 96,* it was said (at *p. 99*) :

"The language of the act, if construed literally, evidently leads to an absurd result.

"If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity.    The court must restrain the words.    The object designed to be reached

by the act must limit and control the literal import of the terms and phrases employed."

In *Mendles* v. *Danish, 74 N. J. Law 333,* the supreme court held that—

"In construing a statute, where ambiguity exists or literal interpretation may lead to absurd results, resort may be had to the principle that the spirit of the law controls the letter."

If regarded as a penal statute there would be no escape from the view that it included both kinds of contempt. As stated in *36 Cyc. 1183:*

"It is a fundamental rule in the construction of statutes that penal statutes must be construed strictly. By this rule, however, it is not meant that they should be subjected to any strained or unnatural construction in order to work exemption from their penalties. Such statutes are to be interpreted by the aid of all the ordinary rules for the construction of statutes, and with the cardinal object of ascertaining the intention of the legislature. Citing: *State* v. *Hand, 71 N. J. L. (42 Vr.) 137.*"

But, doubtless, these rules of construction do not have to be resorted to in vindication of the prerogative court's power to punish for a contempt committed *in facie curiæ.* In one view, and that at least a permissible view, the power to commit for such a contempt is within the letter of the act. The pertinent language of the statute is that—

"If any person shall neglect or refuse to obey any * * * sentence or decree of the ordinary or judge of the prerogative court, it shall be lawful * * * to cause such person * * * to be taken and imprisoned until he shall obey or perform said sentence or decree."

Now, if the ordinary should adjudge a person to be guilty of a contempt *in facie curiæ* and should sentence him to, say, thirty days' imprisonment, the order made thereupon would contain such sentence, and would direct that a warrant issue to enforce it. The warrant would issue to the sheriff, as in other cases of enforcement of criminal sentences, because the offenders of the law never go voluntarily to jail and are always taken on process issued upon the sentence. Therefore, *obedience* to the ordinary's *sentence* would be enforced under the stress of the warrant issued

upon his sentence, just as in the case of all other criminal sentences. And thus I say it is that imprisonment to enforce a sentence of the ordinary as for a contempt *in facie curiæ* appears to be within the letter of the statute. But, if not, then it seems to me that it must be within the spirit and meaning of the act, according to the rules to which resort is had for the construction of statutes of the kind under consideration.

Upon the authorities cited, and for the reasons above stated, I am clearly of opinion that the prerogative court has power to punish for contempts, both direct and consequential; but, even if that power had not inhered in its very creation and institution, it would, it seems, have long since acquired it because of the importance of its state-wide probate and appellate jurisdiction and because its constitutional judge is the chancellor. See *Croasdale* v. *Atlantic Quarter Sessions, 88 N. J. Law 506.*

Contempts are not only civil or criminal, but are also either direct, which openly insult or resist the powers of the courts, or the persons of the judges, or are consequential, which, without gross insolence, and direct opposition, plainly tend to create a universal disregard of their authority. *4 Bl. Com. 283.*

It is unnecessary to consider what are the consequential contempts, if the contempt before me was not of that character, but was direct. It was direct if it affected directly the power and the dignity of the court. Direct contempts are those usually referred to as contempts in the face of the court (*in facie curiæ*), but this does not mean that such contempts must be committed while the judge is presiding in open session in the court room. Contempts which are not *in facie curiæ* are, generally speaking, a disobedience of the judgments and decrees *inter partes,* and may be for the benefit of one party as against the other.

In *7 Halsb. L. Eng. 283 § 609,* treating of contempt in the face of the court, it is stated that it is not that the contempt should be in court, or that it should be a contempt of the judge sitting in court; it must be a contemptuous interference with judicial proceedings in which the judge is acting as a judicial officer. Citing *Re Johnson, 20 Q. B. D. 68.* In that case, Lord Esher, M. R., observed (at *p. 71*) :

"The main argument appears to come to this, that there was no contempt in court; but it does not follow that there was no contempt of court. The same fallacy seems to underlie all the argument. It was said that a judge sitting in chambers was not in sitting in court, and that, even if he received a blow in the room in which he was so sitting, that would not be a contempt of court, because it would not be a contempt of him in court. It is not necessary to constitute a contempt of court that the contempt should be in court, or that it should be contempt of a judge sitting in court. All that is necessary is that it should be a contemptuous interference with judicial proceedings in which the judge is acting as a judicial officer. This proposition is laid down in terms in a learned judgment by Chief-Justice Wilmot which, though never delivered in court owing to the proceedings in the case having dropped, contains nevertheless a most valuable exposition of the law on the subject. I refer to the judgment which he had prepared for delivery in the case of *Rex* v. *Almon*.

"He there says: 'The question resolves itself at last into this single point, whether a judge making an order at his house or chambers is not acting in his judicial capacity as a judge of this court, and both his person and character under the same protection as if he was sitting by himself in court? It is conceded that an act of violence upon his person when he was making such an order would be a contempt punishable by attachment. Upon what principle? For striking a judge in walking along the street would not be a contempt of court. The reason, therefore, must be that he is in the exercise of his office and discharging the function of a judge of this court; and, if his person is under this protection, why should not his character be under the same protection?' The chief-justice was there speaking of contemptuous conduct directed towards the person or character of a judge so acting in a judicial capacity, but the same principle applies, as it seems to me, to contemptuous conduct and expressions in relation to his proceedings in the course of the administration of justice. If he is acting judicially in the office of a judge, he is acting as a judge of the high court of justice. It signifies not where he is sitting, or what he is

doing in such judicial capacity. ·If anyone attempts' to interfere improperly with such judicial proceedings, provided it is done with sufficient nearness, it is a contempt; a contempt is not of the judge, but of the high court as a judge of which he is acting."

*In re Woolley, 11 Bush (Ky.) 95,* the supreme court of Kentucky was concerned with a contempt committed in the use of offensive language in a petition for the rehearing of a case, which counsel addressed and sent to the judges. The court said (at *p. 99*) :

"Woolley's offences were committed in the presence of the court. · The petition for a rehearing is not a pleading, but an argument addressed to the court and to the individual members of the court. His statement was in most respects personal to himself and was intended to be so considered. The petition was the counsel's argument in support of the motion for a rehearing, and the counsel, and not the client, is responsible to the court for the character of the argument and for the insinuations, imputations and charges which the petition may contain. Written or printed arguments, whether in the shape of briefs or petitions for a rehearing, are filed in open court, are signed by counsel, and are addressed to the court just as oral arguments are addressed, and to incorporate into such arguments contemptuous, scandalous, or insulting matter is to commit in open court an act constituting a contempt. * * *

"The object in citing him to appear was not to enter into an inquiry as to whether at some time or place out of court he had, by acts or words spoken, written, or printed, committed a contempt of the court, but to afford him an opportunity to purge the contempt committed in court by explanation, apology, or retraction, or, in case of his refusal, or failure to do so, to allow him to show cause why punishment should not be inflicted.

"The precedent of Lord Cottingham in the case of *Lechmere Charlton, 2 Myl. & Cr. 317,* was followed in this case. Charlton, who was a barrister, addressed to the master of the rolls a letter relating to a matter pending before him. He also wrote to the lord-chancellor a letter touching the same subject.

"The lord-chancellor directed an order to be made requiring him to show cause why he should not be committed for contempt.

"The order stated 'that one of the masters of the court had received a letter directed to him and signed "E. L. Charlton," containing matter scandalous with respect to the said master, and an attempt improperly to influence his conduct in the matter pending before him; and that his lordship had received a letter addressed to himself, dated Ferdale's hotel, Palace Yard, 9th November, 1836, and signed "E. L. Charlton," acknowledging that he, the said E. L. Charlton, was the writer of the said letter dated the 24th of October, 1836; and also the affidavit of Joseph Parkes, proving the said letters to be of the handwriting of Edmund Lechmere Charlton, being read, his lordship, upon taking said matter into consideration, and deeming the conduct of the said Edmund Lechmere Charlton therein a contempt of this court, doth think fit, and so orders, that the said Edmund Lechmere Charlton, having personal notice hereof, do show cause unto this court the 22d day of November, instant, why he should not be committed to the Fleet for his said contempt, and that he do then personally attend this court.'

"It will be observed that this order does not set out the language contained in the two letters; that it does not explain the character of the improper attempt to influence the master, nor in what the 'scandalous matter' consisted; yet it was deemed sufficient by the lord-chancellor to warrant him in committing Charlton, who was a member of parliament, to prison."

In *Osw. Conl. Ct.,* it is stated (at *p. 48*):

"It is a grave contempt of court to communicate with, or to seek in any way to influence a judge upon the subject of any matter which he has to determine. Thus a person who wrote a letter to the Lord Chancellor relating to a threatened suit, and enclosed a bank note, was held guilty of a contempt and ordered to attend personally and show cause why he should not be committed; but afterwards, on his appearing and expressing contrition, he was discharged on payment of costs. The contempt is the same whether the communication be accompanied by abuse or by a bribe or not."

In the *Matter of Dyce Sombre, a lunatic, 1 Mac. & G. 116* (at *p. 122*), Lord-Chancellor Cottenham observed:

"Every private communication to a judge, for the purpose of influencing his decision upon a matter publicly before him, always is, and ought to be reprobated; it is a course calculated, if tolerated, to divert the course of justice, and is considered, and ought more frequently than it is, to be treated as, what it really is, a high contempt of court. It is too often excused on account of the station in life of the parties, and their supposed ignorance of what is due to a court of justice. No such excuse can be made in the present instance. If this was not intended as a private communication, why was it made in that form? Why was it not brought before the court in the usual manner through the solicitor and counsel of the party, who alone can be recognized as representing him? I have received from two of the subscribers to that letter, Lords * * * and * * * , assurances that nothing disrespectful to myself was intended by that communication. I never considered it in that light; but as judge of the court against which contempt has been committed, I am bound to express my high reprobation of the course pursued." * * *

*In re May, 1 Fed. Rep. 737, 743,* it was held that *U. S. Rev. Stat.* § 725, concerning contempt of federal courts, and providing that the power to punish should only extend to misbehavior in their presence, or so near thereto as to obstruct the administration of justice, was passed for the purpose of preventing those courts from interfering with newspaper comments upon trials. And in *Morse* v. *Montana Ore-Purchasing Co., 105 Fed. Rep. 337, 347,* adverting to the section just referred to, the court observed that the publishers of a certain newspaper seemed to have been advised of the limited power of federal courts to punish for contempt under that statute, for it refers to the fact that the publishers had not brought the paper into court or hawked it in the presence of the court. Clearly the court was of opinion that, had the paper been exhibited to the judge in court or its sale solicited in his presence, it would have been contempt *in facie curiæ,* notwithstanding the provision of the federal statute; and this reasoning would make it appear that the sending of a contumelious letter to a judge concerning a

cause before him is a contempt committed in his face, although it was written out of court, if he receives and reads it.

Upon the authorities from which I have quoted—and they were selected from among others which are to the same effect— I am of opinion that Merrill's letter to me, set out above, appears on its face, to be a contempt of court, and to be a direct contempt, that is, a contempt *in facie curiæ*, and for this, in my opinion, as already stated, Merrill should be charged with contempt and required to answer for the same at the bar of the court.

The proper proceeding, that is, the process whereby Merrill should be summoned will now be examined.

*In re Cheeseman, 49 N. J. Law 115,* the supreme court said (at *p. 142*) :

"No doubt the ordinary course of practice in such cases in courts of law is that an affidavit of the facts should first be presented; then, that a rule should be entered requiring the alleged offender to show cause why he should not be attached for contempt; then, if good cause be not shown, that an attachment should issue, and the accused, on being brought in, should be either held to bail or committed to answer interrogatories; then, that interrogatories should be exhibited and answered; and thereupon, according as his answers confess or deny his guilt, he should be punished or discharged. But the practice has not been uniform. Sometimes a rule to show cause has been allowed without an affidavit on a mere suggestion; sometimes an attachment has issued without a rule to show cause; sometimes punishment has been inflicted forthwith on the offender's confession when brought in by the writ, without interrogatories; and sometimes, as in *McQuade* v. *Emmons, 38 N. J. Law 397,* the penalty has been imposed on the offender's admissions made under the original rule, without either writ or interrogatories. So that these various steps are manifestly not jurisdictional, except as to the extent of laying before the court matters which constitute a contempt, and affording to the party accused a fair opportunity of denying or confessing their truth."

In *Rodberg* v. *Lamachinsky, 74 Atl. Rep. 44,* Vice-Chancellor Howell pointed out the difference between attachment for con-

tempt and order for committal, showing that the former distinction between the two was that committal was the proper remedy for a party's doing a prohibited act, and attachment for his neglect to do some act ordered to be done. The order for committal was made upon affidavits and directed that the respondent stand committed for his contempt, specifying the nature of it, unless he should at a time and place named appear before the court and purge himself of the charge. The vice-chancellor said:

"These two methods of proceeding in contempt cases have subsisted side by side in our equity practice for many years. Generally speaking, the proceeding has been by way of order to show cause to such an extent that proceedings by way of attachment are very little resorted to, and the old proceeding by committal almost entirely forgotten."

It may not here be out of place to make some observation upon procedure in the ecclesiastical courts, and show that it partook of the nature of the chancery proceedings rather than that of the courts of common law. The old method of taking testimony in the ecclesiastical courts was by written depositions taken by an examiner, but that was altered in England by statute of *17 & 18 Vict. ch. 47*, which introduced *viva voce* testimony, the same as in proceedings in cases at *nisi prius*. And this too was the practice in our prerogative court until the institution of vice-ordinaries and the taking of testimony *viva voce*, as in chancery suits before vice-chancellors.

The prerogative court has ever been regarded as an ecclesiastical court and does not properly come under the denomination of a court of law or equity. *Harris* v. *Vanderveer's Executors, 21 N. J. Eq. 434; Wood* v. *Tallman Executors, 1 Coxe 155, 158.*

Now, while the prerogative court is neither a court of law nor equity, its proceedings, nevertheless, are more nearly assimilated to those obtaining in the court of chancery than in the common law courts, and, although proceedings in contempt in chancery, of all kinds, have very largely, in recent times, been by order to show cause—nevertheless, the old practice of issuing an attachment, whenever deemed advisable, still obtains in the practice of the court of chancery.

As the case before me is one of criminal, and not civil or remedial contempt, I think that the proceeding should be according to the old practice; namely, by attachment which issues only upon notice to the alleged contemnor.

There are no reported cases of any contempt proceedings in the prerogative court. I have had the files of that court searched from the present to the earliest times, and find but one case in which contempt proceedings were instituted. That was in *Perrine* v. *Petty,* in year 1881 (*Reg. 6, p. 386*). It was a civil contempt and was instituted to coerce the respondent into obeying an order requiring him to pay to the register of the court a sum of money for the benefit of a party. Chancellor Runyon, as ordinary, made an order on the delinquent to show cause before him "why he should not be attached for contempt." The rule was subsequently discharged upon the party's complying with the order contemned and also upon payment of costs and counsel fee.

Now, as the only precedent in this court to bring a party in to answer for contempt, is by way of attachment, and as that is undoubtedly a practice which may be pursued by any court having power of punishment for contempt, and, especially as this is a criminal contempt, I am of opinion that an unexceptional method of procedure would be by attachment, which is a bailable writ, issuing only after notice. Whether upon interrogatories propounded the answers of the respondent must be accepted as true, as in courts of law, or may be contradicted and disproved, as in courts of equity, I am not now called upon to decide, but desire to state that I incline to the view that the answers would not have to be accepted. On this question see *Appeal of Verdon, 97 Atl. Rep. 783.* I should very much doubt if a contemnor even in a court of law could successfully assert that plain and unequivocal words meant something else than what they clearly imported. *In re Woolley, ubi supra,* and *People* v. *Wilson, 64 Ill. 195,* I find this question decided.

*In re Woolley, 11 Bush (Ky.)* (at *p. 109*), the court said:

"With the record in this condition respondent's counsel insists that the proceeding against his client should be dismissed, because he has purged himself of the alleged contempt by deny-

ing upon oath that he intended to be disrespectful, discourteous, or insulting to the court. We recognize, to the utmost reasonable limit of its application, the rule that a supposed contempt consisting in mere words, which are apparently intended to be scandalous and offensive, but which are at all susceptible of a different construction, may be explained or construed by the speaker or writer, and that upon his sworn disavowal of an intention to commit a contempt, proceedings against him must at once be discontinued.

"But this rule does not control where the matter spoken or written is of itself necessarily offensive and insulting. In such a case the disavowal of an intention to commit a contempt may tend to excuse, but it cannot and will not justify the act. *The People* v. *Freer, 1 Caines 485.*"

In *People* v. *Wilson, 64 Ill.* (at *p. 212*), the court said:

"It need hardly be said that we cannot accept, as a reason for discharging the rule, the disclaimer in the answers of an intentional disrespect or any design to embarrass the administration of justice. The meaning and intent of the respondents must be determined by a fair interpretation of the language they have used. They cannot now escape responsibility by claiming that their words did not mean what any reader must have understood them as meaning."

Being clearly of the opinion that the contempt in this case is a direct and not a consequential one, the act concerning contempt of courts (*P. L. 1917 p. 71*), which provides that no power of any court to punish for contempt shall be construed to extend to any case except the misbehavior of any person in its actual presence, the misbehavior of any officer of court in his official transactions and the disobedience or resistance by any officer or other person to any lawful writ, process, order, rule, decree or command of the court—does not apply. A contempt in the court's "actual presence" must mean, I think, contempt *in facie curiæ* as understood and defined by the law, and which, as we have seen, does not exclusively concern itself with contempt committed in the court room while the court is in open session. But even if the letter and spirit of this act excluded the contempt under consideration, its constitutionality as applied to the

prerogative court may well be doubted. Said Chief-Justice Beasley in *Harris* v. *Vanderveer's Executor, 21 N. J. Eq. 424* (at *p. 434*):

"The prerogative court has constitutional sanction, and according to the principles already propounded, cannot be shorn of any of its inherent functions or substantial jurisdiction."

The court of errors and appeals has held that the legislature cannot impair the jurisdiction of a constitutional court. *Flanigan* v. *Guggenheim Smelting Co., 63 N. J. Law 647.* See also *In re Thompson, 85 N. J. Eq. 221, 236.*

As it appears that Merrill's letter to the ordinary is a contempt of the power, authority, dignity and integrity of the prerogative court *in facie curiæ,* an order will be made upon him to show cause why he should not be attached therefor.