34 N.J. Super. 394 (1955)
112 A.2d 584
CHARLES F. VAN SWERINGEN, PLAINTIFF,
v.
KATHERIN T. VAN SWERINGEN, DEFENDANT, AND MILTON G. ABARBANEL, INTERVENOR-DEFENDANT. IN THE MATTER OF L. EDWARD KATZ, AN ATTORNEY AND DEFENDANT-APPELLANT HEREIN.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 1955.
Decided March 4, 1955.
*396 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Albert S. Gross argued the cause for the defendant-appellant.
Mr. Morris Malech, Assistant Prosecutor, argued the cause for the State of New Jersey, respondent (Mr. Guy W. Calissi, Bergen County Prosecutor).
The opinion of the court was delivered by FRANCIS, J.A.D.
Appellant Katz, a member of the bar of this State, was convicted of criminal contempt in the *397 Chancery Division of this court and sentenced to four months in the Bergen County Jail. He appeals, urging: (1) that the trial court lacked jurisdiction to hear the matter and that he was deprived of procedural due process, (2) the proof was not sufficient to establish his guilt beyond a reasonable doubt, and (3) the action of the court in deferring the sentence for 21 days after the determination of guilt invalidated the judgment.
Charles F. Van Sweringen sued his wife, Katherin T. Van Sweringen, for divorce on the ground of adultery. Dr. Milton G. Abarbanel, a friend of the defendant Katz, was named a corespondent. He intervened in the action but through another attorney. At the conclusion of the trial of the matrimonial cause on April 21, 1954 decision was reserved. On May 25, 1954 an opinion was filed which declared that the charge had not been established.
A short time thereafter information came to the attention of the trial judge, apparently from the prosecutor's office of Bergen County, pointing to possible improper conduct on the part of Katz and the official reporter of the court with respect to the case. Immediate arrangements were made for the appearance before the court on June 30, 1954 of Dr. Abarbanel, his wife Zelma, Katz, and representatives of the prosecutor's office and of the Ethics and Grievance Committee of the Bergen County Bar Association.
The record indicates that on this day an informal investigation of the matter was conducted in the judge's chambers, and that statements of the various interested parties were taken stenographically. At the outset of the inquiry Katz was not present. Dr. Abarbanel was sworn and after answering some preliminary questions put by the court, refused to give further information under oath, saying that his attorney (who was not in attendance) had advised him not to discuss the matter in his absence. A telephone call was made to the attorney, following which the court, who obviously was anxious to get to the bottom of the matter without delay, allowed him to proceed as an unsworn witness. Thereafter no participant in this preliminary phase of the matter was sworn.
*398 Dr. and Mrs. Abarbanel gave statements in question and answer form to the effect that Katz had told them that for $700, later increased to $1,500, a favorable decision could be obtained through influence possessed by a person close to the court. Their impression was that the person referred to by Katz was the court reporter who had taken the testimony in the divorce case.
Upon the completion of their statements they were dismissed. Katz was brought into chambers and told specifically by the court what the Abarbanels had said about his conduct. In addition, the court read similar portions of another statement of Dr. Abarbanel which was produced by the assistant prosecutor. Katz denied their assertions.
It appears also that the unsworn testimony given on this occasion by the Abarbanels was transcribed and that on July 6 Katz was permitted to examine it in the prosecutor's office.
On July 13 an order was issued by the court requiring Katz to show cause on July 27 why he should not be adjudged in criminal contempt. The order recited:
"It appearing to the satisfaction of the court, from statements made to it by Milton G. Abarbanel and Zelma Abarbanel, and L. Edward Katz, that while the above entitled proceeding was awaiting determination by this court, an effort is alleged to have been made by L. Edward Katz, Esquire, a member of the Bar of this State, who did not represent any of the parties to this proceeding, to influence Milton G. Abarbanel and Zelma Abarbanel to pay to the said L. Edward Katz the sum of $700, and which amount was later on increased to $1,500 for the purpose of obtaining a judgment favorable to the said Milton G. Abarbanel through influence alleged to be possessed by David Friedman, an official court reporter employed by the said court, all of which would tend to impugn the honor and dignity of the court, and seriously prejudice the due and orderly administration of justice; and it further appearing from the information supplied to the court that it is alleged that the said L. Edward Katz purported to have information concerning the proposed decision of this court in the premises, and the court having duly considered the premises; * * *."
Thereafter followed the mandate to show cause.
Trial of this charge took place on July 27, 1954 and on August 9 Katz was found guilty. Sentence was "deferred" *399 until August 30, when the imprisonment already referred to was imposed in open court.
It is not disputed that the conduct charged against defendant constitutes criminal contempt. Such willful acts or conduct plainly obstruct or tend to obstruct the course of justice. In re Jeck, 26 N.J. Super. 514 (App. Div. 1953), certification denied, 13 N.J. 429 (1953); In re Caruba, 139 N.J. Eq. 404 (Ch. 1947), affirmed 140 N.J. Eq. 563 (E. & A. 1947), petition denied 142 N.J. Eq. 358 (Ch. 1948), certiorari denied 335 U.S. 846, 69 S.Ct. 69, 93 L.Ed. 396 (1948); In re Merrill, 88 N.J. Eq. 261 (Prerog. 1917); Fox v. United States, 77 F.2d 210 (4 Cir., 1935), certiorari denied Ex parte Fox, 298 U.S. 642, 56 S.Ct. 935, 80 L.Ed. 1374 (1935). However, it is urged strenuously as the first ground for reversal that the proceedings were fatally defective and that Katz was deprived of due process because they were not initiated by sworn affidavits or sworn testimony, nor was the order to show cause issued on such proof.
A number of texts and authorities are cited for the proposition that when a contempt is not in the presence of the court, which is the situation here, a sufficient initiatory affidavit or sworn statement is a jurisdictional prerequisite to the prosecution of the offense. 17 C.J.S., Contempt, § 72; 12 Am. Jur., Contempt, § 68; Annotation, 118 A.L.R. 155, 156; Charles Cushman Co. v. Mackesy, 135 Me. 490, 200 A. 505, 118 A.L.R. 148 (Sup. Jud. Ct. 1938); In re Wood, 82 Mich. 75, 45 N.W. 1113 (Sup. Ct. 1890). We agree that when the drastic power of the court to deal with a constructive contempt is called into action, the better practice is to set the matter in motion by sworn statements in testimony or affidavit form. See Swanson v. Swanson, 8 N.J. 169 (1951); Nussbaum v. Hetzer, 1 N.J. 171 (1948); Rodberg v. Lamachinsky, 74 A. 44 (Ch. 1909, not in official reports); Kocher, Chancery Practice 463 (1913); Kocher & Trier, New Jersey Chancery Practice and Precedents, § 1658 (1924). But previous to the adoption of the new rules, it could not be said that a settled or uniform practice existed for such cases in New Jersey and that the jurisdiction of the *400 court to act depended upon a rigid adherence thereto. Attorney-General (Hudson County Quarter Sessions) v. Verdon, 90 N.J.L. 494 (E. & A. 1917), reversing In re Verdon, 89 N.J.L. 16 (Sup. Ct. 1916); In re Cheeseman, 49 N.J.L. 115 (Sup. Ct. 1886). Contempt proceedings are sui generis (Conley v. United States, 59 F.2d 929, 935 (8 Cir., 1932); 12 Am. Jur., Contempt, § 66, p. 433; Cyc. of Fed. Procedure (3d ed. 1953), §§ 87.02, 87.29), and in the absence of a specific rule regulating the mode of initiating them no particular form of procedure is necessary. Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925); Camarato v. United States, 111 F.2d 243 (3 Cir., 1940), certiorari denied 311 U.S. 651, 61 S.Ct. 16, 85 L.Ed. 416 (1940); Conley v. United States, supra; Annotation, 93 L.Ed. 578; 12 Am. Jur., Contempt, § 66, note 12.5 and supplement to p. 434 (pocket part).
This does not mean that no procedural essentials existed in contempt cases prior to those now prescribed by R.R. 4:87-2. It has always been necessary to observe the inexorable demands of due process. Discussing this question the United States Supreme Court, in Cooke v. United States, supra, said:
"* * * The exact form of the procedure in the prosecution of such contempts is not important. The court in Randall v. Brigham, 7 Wall. 523, 540 (19 L.Ed. 285, [293]), in speaking of what was necessary in proceedings against an attorney at law for malpractice, said:
`All that is requisite to their validity is that, when not taken for matters occurring in open court, in the presence of the judges, notice should be given to the attorney of the charges made and opportunity afforded him for explanation and defence. The manner in which the proceeding shall be conducted, so that it be without oppression or unfairness, is a matter of judicial regulation.'
The court in [Ex parte] Savin, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150, applied this rule to proceedings for contempt.
Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. * * *." 267 U.S. at page 536, 45 S.Ct. at page 395, 69 L.Ed. at page 774.
*401 The annotation in 93 L.Ed. 578, 580, supra, sets out the rule in this fashion:
"While due process does not require that the proceedings take any particular form so long as the substantial rights of the accused are preserved, and the particularity required of an indictment is not necessary for an information charging contempt, it does require that the accused shall be fairly advised of the offenses with which he is charged so as to enable him properly to prepare his defense thereto, and of the time and place for hearing of the charges."
See also: Camarato v. United States, supra; Conley v. United States, supra; O'Connell v. United States, 40 F.2d 201 (2 Cir., 1930), certiorari dismissed, 296 U.S. 667, 51 S.Ct. 658, 75 L.Ed. 1472 (1930); United States v. Wimberly, 39 F. Supp. 722 (D.C.W.D. La. 1940).
Rule 42(b) of the Federal Rules of Criminal Procedure (18 U.S.C.A.) codified these requirements to "make more explicit `the prevailing usages at law'" (Sacher v. United States, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717, 723 (1952)), and our own Revised Rule 4:87-2 was patterned after it. Our rule provides:
"Every other contempt (except that committed in the presence of the court), whether of a criminal or civil nature, shall be prosecuted on notice, and if it occurs in an action, it shall be prosecuted in the action in which it occurs. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense and shall state the essential facts constituting the contempt charged. Whether the contempt charged is criminal or civil in nature, the notice may be given by an order to show cause; * * *." (Insertion ours.)
It will be observed that, like the federal rule, no mandate is included as to the form of proof that shall be demanded as support for the issuance of an order to show cause. And on the federal scene it has been declared in a number of situations involving indirect contempts that affidavits are not necessary. Laughlin v. United States, 80 U.S. App. D.C. 101, 151 F.2d 281 (D.C. Cir. 1945), certiorari denied 326 U.S. 777, 66 S.Ct. 265, 90 L.Ed. 470 (1945); N.L.R.B. v. Arcade-Sunshine Co., 74 App. D.C. 361, 122 F.2d 964 *402 (D.C. Cir. 1941); Brown v. Brown, 74 App. D.C. 150, 121 F.2d 101, 136 A.L.R. 500 (D.C. Cir. 1941); In re Fletcher, 71 App. D.C. 108, 107 F.2d 666 (D.C. Cir. 1939), certiorari denied 309 U.S. 664, 60 S.Ct. 593, 84 L.Ed. 1011 (1940); Conley v. United States, supra; United States v. Wimberly, supra; Bowles v. United States, 50 F.2d 848 (4 Cir., 1931). And see Fletcher v. United States, 174 F.2d 373 (4 Cir., 1949), certiorari denied, 338 U.S. 851, 70 S.Ct. 82, 94 L.Ed. 521 (1949); Osborne v. Purdome, 244 S.W.2d 1005, 29 A.L.R.2d 1141 (Mo. Sup. Ct. 1951), certiorari denied 343 U.S. 953, 72 S.Ct. 1046, 96 L.Ed. 1354 (1952).
The conclusion may be drawn from these modern rules and the cited cases that affidavits are not mandatory in every contempt proceeding and that the present-day trend is to lay emphasis in such proceedings upon adequate notice of the charges, reasonable time for preparation for the hearing thereon, and full and fair hearing, rather than upon the preliminary steps or means by which the matters which prompted the issuance of the order to show cause were brought to the attention of the court. If these elements of due process are faithfully respected, irregularities in the customary preliminary procedural steps should not provide a basis for reversal of a conviction unless some substantial prejudice is suffered by the defendant. United States v. United Mine Workers of America, 330 U.S. 258, 301, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Gendron v. Burnham, 146 Me. 387, 82 A.2d 773, 38 A.L.R.2d 210 (Sup. Jud. Ct. 1951).
There is no intention to indicate or to sanction a disregard of the procedural pattern that has come to be recognized in the ordinary case as the method of applying for the order to show cause even though it is not referred to in R.R. 4:87-2. Contempt is the most drastic weapon entrusted to a trial judge because of the summary nature of the proceedings and the risk of imprisonment without jury trial. So care should be exercised in ascertaining that a proper record exists for the making of the preliminary determination that probable cause is present for the issuance of the order to show cause. And generally the better practice is to do this by affidavits.
*403 In this case while we deprecate the informality of the proceedings antecedent to the order to show cause, in our judgment no prejudice resulted to Katz. He was adequately advised of the nature of the unsworn testimony given in the trial judge's chambers, and of Dr. Abarbanel's allegations in his statement to the county prosecutor. In addition, he was permitted to read this unsworn testimony three weeks before his trial. Thus he was fully aware of the charges against him. Moreover, the specification of the charges in the order to show cause was not only consistent with that knowledge but was sufficient to satisfy the demands of the rule. Cf. In re Merrill, supra; In re Fletcher, supra; N.L.R.B. v. Arcade-Sunshine Co., supra; Baumgartner v. Joughin, 107 Fla. 858, 143 So. 436 (Sup. Ct. 1932).
Thus we are brought to appellant's attack on the sufficiency of the evidence upon which his conviction was founded. The contempt being criminal in nature of course requires proof of guilt beyond a reasonable doubt. Swanson v. Swanson, 10 N.J. Super. 513, 520 (App. Div. 1950), affirmed 8 N.J. 169 (1951); Patco Products Co. v. Wilson, 140 N.J. Eq. 91 (Ch. 1947).
The record discloses that in May 1954, after the trial of the divorce action and pending the announcement of the decision, a Dr. Samuel V. Reich received a visit from David Friedman, the official reporter of the trial court, who was a patient of his. Reich knew Abarbanel and the conversation turned to the Van Sweringen case.
A short time later Reich met Abarbanel and told him of the talk with Friedman. Abarbanel had been discharged from the United States Army in 1946 because of an "anxiety state" and granted a pension representing ten percent of total disability. Subsequently he was attended medically for the condition at intervals. In a deposition taken after the trial of the contempt charges it appeared that he had received treatment therefor from a local psychiatrist ten or eleven times in 1953 and down to about August 1954. He "didn't know" if he had been discharged.
*404 After meeting Dr. Reich, Abarbanel came to see the defendant Katz in a nervous and agitated state. He knew Katz socially and professionally, and told him that he was frightened because he was going to lose the case. He said that information had come to him from Dr. Reich that the court reporter had said Abarbanel was in trouble and his case "doesn't look good." In the course of further discussion Abarbanel asked Katz to get some information as to the status of the case, to which Katz replied that he "would think about it and he would see."
A short time later Katz telephoned Abarbanel and said he had important information which he did not wish to impart over the phone. Arrangements were made for a visit to the doctor's office and Katz appeared there in the early evening with his infant child who was only a month or two old. He informed Abarbanel that he had received a call from "somebody who has often been of great help" to him to the effect that for a remembrance of $700 a favorable decision could be obtained in the divorce action. Katz declined to disclose this person's identity and there was no discussion as to how the money was to be paid.
Abarbanel called his wife into the office and the matter was discussed with her. And the evidence shows that on this occasion Katz advised him that an adverse finding would result in revocation of his license to practice medicine and the assessment of counsel fees against him in the divorce action because he had intervened, and that if he appealed the costs would be substantial. No decision was reached and Katz left after his child had been examined.
The next morning, according to the doctor, Katz again telephoned and said that $700 was not enough; the unnamed person wanted $1,500. Mrs. Abarbanel testified that she and her husband talked the matter over and decided against any payment. Later in the day Katz called and in the doctor's absence Mrs. Abarbanel said she advised him of their decision.
Thereafter, the doctor and his wife went to see Joseph H. Gaudielle, Esq., who represented Abarbanel in the divorce case. After talking with them he called Friedman. Some *405 time later, the exact time not having been shown, but seemingly after the decision had been rendered, Mr. Gaudielle saw Katz trying a case and said to him, "You know, if I were a mean guy I could hurt you an awful lot." Katz smiled and made no reply, nor did he at any other time inquire as to the significance of the comment.
Katz denied ever having talked to Friedman about the divorce case or that Dr. Abarbanel had ever mentioned Dr. Reich's name to him in connection with it. However, Dr. Reich asserted and Katz admitted that they met at a dinner at which time Katz said he would like to talk to him "after dinner about Abarbanel." Reich said this was in May and before May 25; Katz believed it was in March.
Appellant further denied that he ever told Abarbanel that for a payment of $700 or $1,500 a favorable result could be obtained. He conceded that in May he brought his child to the doctor's office in the evening for a check-up. After the baby was examined, Abarbanel said he was "scared" because he was going to lose the case; "the judge doesn't like Gaudielle. I got a tip off that I am going to lose the case." Then followed the discussion in which Katz informed him about the loss of his license to practice medicine, the possibility of counsel fees being assessed against him and the costs of an appeal. Katz said counsel fees could be "anywheres from $150 to $1,000." Costs of appeal up to $1,500 were mentioned; he "could have" mentioned the figure of $700 in this connection as well as other sums.
It was admitted that Mrs. Abarbanel came into the room and held his baby for a while. The matter of these fees and costs was discussed again while she was present, but nothing else.
Abarbanel's testimony about the increased figure of $1,500 was disputed and Katz also denied any telephone conversation with Mrs. Abarbanel later the same day in which she advised him of their refusal to make any payment. He said he next heard about the case when he had a call from the doctor who informed him of the favorable decision of the court.
*406 Upon appeal from summary conviction for contempt, the obligation of the Appellate Division is to review both "the law and the facts" and to "give such judgment as it shall deem to be lawful and just." R.R. 1:5-2; 2:5. In observance of this rule we have studied the record independently and have endeavored to appraise the testimony of the witnesses in the light of the basic doctrine that guilt must appear beyond a reasonable doubt.
The record presents a number of irreconcilable inconsistencies in the statements of the principal protagonists, the Abarbanels and Katz, and we must judge them with a consciousness that we neither heard them asserted nor observed the attitude or demeanor of the assertors. However, in our evaluation of the contradictions on the critical phases of the inquiry, we are aided by a conviction that the Abarbanels were friendly and sympathetic toward Katz, that they did not intend to make a complaint against him, that Dr. Abarbanel particularly was reluctant to testify against him and that his inclination and effort were to underemphasize and minimize Katz's participation in the affair. This conclusion seems inescapable to us even though we may agree that the doctor showed himself to be an anxious and emotionally unstable person. A short excerpt from the testimony exhibits his friendly attitude toward the accused:
"Q. Did you think, sir, that your friend L. Edward Katz was trying to extort money from you? A. I never thought so for one single moment.
Q. Do you think so today? A. I do not think so today.
Q. But you had an idea in the back of your head that somebody was trying to do this to you. Is that correct? A. Yes, and I still do.
Q. And because you have that idea you came forward to make or to initiate this charge against L. Edward Katz? A. No, the charge was not to be initiated against L. Edward Katz.
I may as well be frank and say that I did not know at that time that L. Edward Katz acted in any way against the law. I did not know that he was doing something for me as a great personal favor was frowned (sic) upon by the courts or judges. I was absolutely innocent of that idea. * * *"
*407 It does not seem necessary to set out in any greater detail the analysis which has produced our final conclusion. Suffice it to say that it is our considered judgment that guilt of the criminal contempt charged has been established beyond a reasonable doubt.
It must be noted in passing that the judge who heard the divorce action presided at the trial of these proceedings. The legal propriety of this in the light of R.R. 4:87-2(d) is not challenged. In fact, at the oral argument an express disclaimer of any such challenge was announced and no suggestion has been made that Katz did not receive a fair trial. Consequently, it is not necessary to express an opinion on the subject. However, in view of the delicate atmosphere of the case generated at the outset by the insinuated involvement of an attache of the court, we are inclined to question the wisdom of his continuing in the cause.
Although not directly in point, the views of the United States Supreme Court in Cooke v. United States, supra, are worthy of mention:
"* * * The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice, and in maintaining the authority and dignity of the court, is most important and indispensable. But its exercise is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions. This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the judge. The judge must banish the slightest personal impulse to reprisal, but he should not bend backward, and injure the authority of the court by too great leniency. The substitution of another judge would avoid either tendency, but it is not always possible. * * * All of such cases, however, present difficult questions for the judge. All we can say upon the whole matter is that, where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge, called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place." (267 U.S., at page 539, 45 S.Ct., at page 395, 69 L.Ed., at page 775.)
As to the last ground of appeal, namely, that the lapse of 21 days between the finding of guilt and the sentence invalidates the conviction, we find no merit. True, R.R. 4:87-3 prescribes that upon the finding of guilt an order *408 shall be entered fixing the punishment. Obviously this means with reasonable promptitude. Cf. Sacher v. United States, supra, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952).
Under the rules of criminal practice sentence must be imposed without unreasonable delay and, of course, it must be rendered in open court. R.R. 3:7-10(c). After this trial the court reserved decision and later filed a memorandum adjudging the guilt of the defendant. The sentence could not have been included therein and deferring it for further consideration for the period involved did not violate any legal requirements nor did it result in any prejudice.
The judgment of conviction is sustained. The defendant is directed to appear before this court for sentence at 10 A.M. on March 21, 1955, at the Hall of Records, Newark, N.J.