This was an orderly foreclosure suit. The bill alleged that on September 15th, 1926, George J. Perlman and William A. Weinmann mortgaged the premises in question to Jelco Realty Company for $17,000; that on September 12th, 1929, George J. Perlman and wife and William A. Weinmann and wife conveyed the mortgaged premises to Pinckney Lee Glantzberg; that subsequent to the execution and recording of the mortgage Perlman and Weinmann leased certain parts of the premises to Smolwitz and Wolfson; that by written assignment October 5th, 1926, the Jelco Realty Company assigned the mortgage (with the bond accompanying the same) to the complainants; that on September 15th, 1929, the entire principal sum of $17,000, plus interest, became due and payable; that after the proper demand the same remained unpaid; and the bill praying for the sale of the mortgaged premises, c., was filed; that such proceedings were thereupon had in foreclosure suit; that on November 25th, 1929, a *Page 212 
decree pro confesso was entered, taking the bill as confessed against the defendants George J. Perlman, William A. Weinmann, Irving Smolwitz and Abe Wolfson, and on December 5th, 1929, a similar decree pro confesso was entered against the defendants Pinckney Lee Glantzberg and Ernest Glantzberg, they having been published against; that on December 12th, 1929, Emanuel Kaplan, solicitor of complainants, lodged with the clerk in chancery a final decree, reciting the above facts, and stating that on reading and filing the report made in the case by one of the masters in this court, it was ordered, adjudged and decreed that the master's report stand ratified and confirmed, that the complainants were entitled to the sum of $17,037.33, with interest and costs, and ordering that a writ of fieri facias be issued to the sheriff of Mercer, commanding him to make sale,c., to satisfy said debt, interest and costs.
On January 14th, 1930, the sheriff of Mercer filed his report in writing, under oath, in the office of the clerk in chancery, certifying that (having first duly advertised the same) he sold the lands and premises described in the execution to Pasquale Astore for $500, and in the affidavit annexed swore that the mortgaged premises were sold for the highest and best price the same would bring in cash at the time of sale. This report remained on file for the requisite time, when, no written (or other) objection to the confirmation of the sale being made, the same was by order duly confirmed, and the sheriff directed to execute a good and sufficient conveyance to the purchaser or his assigns for the mortgaged premises.
On March 24th, 1930, William A. Weinmann and George J. Perlman filed a petition herein setting out inter alia the following: that the premises mentioned in the bill, known as 109 North Broad street, were purchased by the petitioners from the Jelco Realty Company, assignor of the complainants, without stating the date of purchase; that the agreement for the purchase of the premises was made August 24th, 1926, whereby they agreed to purchase the premises from Jelco Realty Company at a valuation of $97,000, subject to two mortgages, one for $50,000 and the other for $15,000; that *Page 213 
the mortgage mentioned in the bill of complaint was given to the Jelco Realty Company to secure part payment of the purchase price of said premises; that at the time of making of the agreement and deed for the mortgaged premises the Jelco Realty Company was composed of the three complainants, Etz, Levinson and Jaspan, and at the time of the commencement of the foreclosure suit the title in fee-simple in the premises in question was in Pinckney Lee Glantzberg; that on December 12th, 1929, a paper-writing was filed in this cause endorsed, "Final Decree;" that the said paper-writing, however, was not signed by this court at the time the writ of fieri facias was issued, and that the sale took place on January 8th, 1930, at the time said decree was still unsigned; that title in fee-simple to the premises at the time of sale was still in Pinckney Lee Glantzberg.
The petitioners then averred that they had a valid and meritorious defense to the said action in that at the time of the making of the said agreement, and until the present time, the only entrance to the upper floors of the building situate on the premises was and is through a doorway in the rear of the building; that at the time the Jelco Realty Company, through its officers and agents, represented to the petitioners that the entrance to said upper floors could be reached over land that was public and which was for the free and common use of the owners of the property in question, together with other owners; that the representation was false; that at that time or now they cannot be reached except over lands belonging to a third person, which are private lands; that Jelco Realty Company intended that the petitioners rely upon those representations, and that petitioners, relying upon them, entered into the agreement and accepted the said deed and executed the mortgage mentioned in the bill, and would not have executed said bond and mortgage had they known that said representation was false; that the reason for the failure of petitioners to answer the bill of complaint was that not until after the premises were advertised for sale did the owner of the lands over which it is necessary to go to reach the entrance, inform petitioners that the lands were private and *Page 214 
that he would not permit anyone to go over them to reach the entrance; that there is now erected on said lands a fence closing up the way to the entrance, rendering the upper floors valueless to the owners thereof; that petitioners are and have been dealers in real estate in Trenton and are and have been for a long time familiar with the value of real estate in Trenton, including the property in the vicinity of the premises in question; that they deemed that at a sale by the sheriff the said premises would bring at least a sum in excess of $15,000, subject to the two mortgages of $50,000 and the second one of $15,000; that the said Pinckney Lee Glantzberg or some other person would bid at least that sum for the premises and that the interest of the petitioners would thereby be protected; that to the great surprise of petitioners said premises were sold for the sum of $500, no bidders appearing for the same except complainants, who bid $475, and the petitioners, who bid through their agent the sum of $500, for which the said premises were sold; that subsequently to the sale there was attached to the final decree the signature of the court.
The petition was verified in extenso by William A. Weinmann and George J. Perlman, and by Max K. Bash, who swore that he is the owner of the premises situate in the rear of the property 109 North Broad street (the mortgaged premises), and familiar with the building thereon, that the only entrance thereto to the upper floors thereof is through a doorway which can only be reached by a way over land owned by him; that when he noticed the advertisement of sale of the mortgaged premises 109 North Broad street he spoke to Perlman and Weinmann, whom he thought were the owners of the property, and informed them that no one was to go over his land to go to the entrance in the rear of the aforesaid building.
The petition then concludes with a prayer that the decrees (pro confesso and final) may be opened, set aside and vacated, to the end that the petitioners may be permitted to answer setting up their aforesaid defense. *Page 215 
In the petition itself the defendants put their best foot forward and their affidavits only amplify the facts alleged by way of defense.
Some propriety has to be accorded to the form and substance of judicial proceedings. And it will be observed that no objection was made under the statute or rules of court as to the legality of the sale of the mortgaged premises. The defendants, petitioners, expert real estate agents as they claim to be, know full well the efficacy of a foreclosure sale and what may be urged against confirmation of that sale.
The only office of a written objection to the confirmation of a sale in foreclosure is to urge its overthrow upon the sole ground that the property did not bring the highest and best price that could be obtained therefor in cash, and that an attack upon the sale on any other ground must be made the basis of independent action, either by bill or petition. Dunlop v. Chenoweth,90 N.J. Eq. 85 (at p. 86). Regarding this the defendants have filed a petition.
Now, what does the petition allege as to cause or causes for opening the decrees in the foreclosure suit and permitting the defendants to answer? And, too, they should have moved to open the order confirming the sale and to open and set the sale aside, because that would have to be done if relief were to be granted to them by way of permitting an answer. In fact, it may be said that this is a fatal defect to the prosecution of this motion.
At the time of making the agreement for sale and the deed for the mortgaged premises to the petitioners, and until the present time, the only entrance to the three upper floors of the building on the premises is through a doorway in the rear, and was known to the petitioners, in fact they plead it in their petition. Then they say that the reason for their failure to answer was that they were not informed that the lands over which they had to pass to reach the doorway were private lands, and that the owner would not permit anyone to go over them to reach the entrance, and that they were so informed by him while the premises were being advertised for sale; that subsequently to the sale there was attached to the *Page 216 
final decree the signature of the court; that by virtue of the premises they are greatly prejudiced and pray therefore, c.
It is a settled principle of jurisprudence that in order to open a decree or judgment entered by default the party applying must show both surprise and merits. Avidan v. Kaplan, 106 N.J. Eq. 43.
The petitioners before the court in this case show neither surprise nor merits. If, pending the advertisement for sale, they learned that the way which they supposed was a public, was only a private one, or no way at all, and that the owner of the premises over which it lay refused to permit anybody to go to the mortgaged premises across his land, they were immediately put upon notice, if not already bound to inquire, and it was their duty to come in promptly at that time and ask to open the decreepro confesso and final decree, to the end that they might answer; but no, they paid no attention whatever to what they now allege was a desperate situation and a hardship for them; on the contrary, they permitted the sale to take place and bid in the property for $500 (subject to encumbrances), which they now say was inadequate. This is an attempt to take advantage of their own wrong, a thing the law forbids.
They say they deemed that at the sale by the sheriff the premises would bring at least a sum in excess of $15,000, subject to the aforesaid two mortgages of $50,000 and $15,000; that Pinckney Lee Glantzberg or some other person would bid at least that sum for the premises, and that the interest of the petitioners would thereby be protected; and they add the astonishing statement that to their great surprise the property was sold for $500, which was their bid through their agent; and then they say that subsequent to the sale the signature of the court was attached to the decree. That will be dealt with hereafter.
If they desired to protect their interests why did they not bid a sum in excess of $15,000, or ask the sheriff for an adjournment so that they could procure a substantial bidder, but they did neither. Besides, they do not now themselves say that if the premises were resold they would bid a sum *Page 217 
substantially in excess of the amount brought at the sale, or produce one who will bid that much, and deposit the money, or its equivalent to guarantee such bid being made, or procure a willing purchaser who will do the same thing.
If, before confirmation, a material advance in price is offered and secured by a deposit or by a bond, the sale will sometimes be opened, further bids received, and a sale to the highest bidder confirmed. 35 C.J. 106 § 170. The person offering the advance is required to secure to the satisfaction of the court the amount offered, and this for the obvious reason that otherwise an actual purchaser, whose bid is secured, might be lost by a mere promise. The amount may be secured either by the applicant complying with the terms of his offer by accompanying the application with the necessary money and notes, or by entering into a written application with good security to comply with the terms of his offer if so ordered by the court. Ibid. 107 § 173. It has been held that when a sale is objected to on the ground of inadequacy of price the objectors who ask for resale should bring the money into court or offer to make an advance bid or give a guaranty or bond that there will be no loss on the resale. Ibid.104 § 166. And such is the constant practice of the court, which ordinarily will not consider such application unless the advanced bid is secured.
It is true that by inadvertence and mistake the signature of the chancellor was not appended to the final decree at the time it was filed and entered, in other words, pronounced by the court; that such want of signing was discovered after the sale and his signature then made on the decree by the chancellor. The exact date is not given by the parties nor does the chancellor remember it, but it was signed prior to the filing of the petition of the defendant-objectors in this cause. The decree was signed in virtue of an order that it should be signed nunc protunc.
In Ruckman v. Decker, 27 N.J. Eq. 244, Chancellor Runyon held that a decree dated February 13th, 1873, and filed on that day, not being in accordance with the opinion of the court, was ordered taken from the files, and a new one was *Page 218 
drawn under specific directions of the then chancellor. It was presented not to him, but to his successor in office, by him signed, and then filed. Motion to take the latter decree from the files as improvidently signed was refused. An order should have been taken, directing the latter decree to be filed nunc protunc, and such order was then made. In that case the decree which was ultimately signed and filed was not signed by the chancellor who decided the cause but by his successor in office. Said Chancellor Runyon (at p. 245): "The power of the chancellor to order a decree to be signed nunc pro tunc, even after a very great interval has elapsed after pronouncing it, is beyond question," citing cases. And, further (at p. 246): "The court will enter a decree nunc pro tunc if satisfied from its own official documents that it is only doing now what it would have done then."
That is not all: The Chancery act (Comp. Stat. p. 425 § 39) provides that when any cause shall be finally determined in the court of chancery, except dismissal by consent, c., the clerk of the court shall enroll the proceedings, which shall be signed by the chancellor as of the date on which such decree was pronounced. And section 43 provides, that if the chancellor by whom any cause shall have been finally heard and determined, shall go out of office, and some other chancellor be appointed before the proceedings and final decree shall have been enrolled and signed in the book kept for that purpose, then it shall be the duty of his successor in office, or the chancellor for the time being, to sign such enrollment with his own name, prefixing to such signature the words: "By the statute;" and all such proceedings and decrees so signed shall be as good and effectual in law to all intents and purposes as if the same had been duly signed by the chancellor who pronounced such final decree.
These provisions have always been construed to apply to decrees themselves as well as to the enrollment, and whether by the same chancellor or by successive chancellors, and I desire to say that during the upwards of eighteen years that I have been chancellor the clerk has presented to me at least a dozen final decrees inadvertently unsigned by certain of my *Page 219 
predecessors in office, and I have signed them, prefixing the words: "By the statute." And I have seen such decrees so signed by other chancellors.
I will now examine sections 39 and 43 of the Chancery act to show that they comprehend decrees themselves, as well as the enrollment thereof. It will be noticed that in section 39 it is provided that the enrollment shall be signed by the chancellor as of the date on which such decree was pronounced, and yet the enrollment is made sometime after the pronouncement of the decree. This is a provision for a nunc pro tunc entry. Of course the enrollment is not signed at the time the decree was made, but it shall be signed as though enrolled on the same date. And section 43 provides that if the chancellor, deciding a cause, shall go out of office and some other chancellor be appointed before the proceedings and final decree shall have been enrolled, that it shall be the duty of his successor in office,or the chancellor for the time being, to sign such enrollment with his own name. Now, what is meant by signing by a chancellor's successor, or the chancellor for the time being? To my mind it means the chancellor who made the decree, who would be the same chancellor, or (disjunctive) his successor, when the original chancellor should have gone out of office. And then follows the significant provision that all such procedings anddecrees so signed shall be as good and effectual to all intents and purposes as if signed by the chancellor whopronounced such final decree, and who, therefore, had not signed it. This means proceedings enrolled, and also decrees, whether enrolled or not: it would be absurd to hold that proceedings and decrees enrolled would be valid and efficacious, but that the decrees themselves, which give validity to the whole procedings, should remain invalid. No intention is discoverable in the act to exclude decrees, and, therefore, they are included as well as the enrollment. Besides, the court itself doubtless has the power to sign at any time, and thus vitalize and give effect to the proceedings. While the language of the act is not the clearest and most explicit, thus requiring construction to point out its meaning, nevertheless, so is the language *Page 220 
found in many acts, and their true interpretation is arrived at by construction.
In Hoguet v. Wallace, 28 N.J. Law 523, it was held that if a case is not within the letter of an act, yet if, by equitable construction, it can be brought within the spirit and intent and within the mischief which the act was intended to remedy, such construction should be adopted. And at p. 527, it was said that if there can be a case proper for the application of the doctrine of equitable construction this is one. And so is the case at bar. It is entirely unreasonable to say that the legislature in enacting sections 39 and 43 of the Chancery act intended to validate enrollments and not by the same token permit the validation of decrees themselves. See, also, In re Merrill,88 N.J. Eq. 261, 273; Moore v. Johnson, 85 N.J. Law 40, 42.
In State, c., v. Mills, Recr., 34 N.J. Law 177, it was held (at p. 180) that it will not be intended that the legislature designed to produce an inequality unless the terms used are so plain and explicit as not to be misunderstood.
It is the theory and intendment of law that the ends of justice shall not be defeated when a decree to which the parties are entitled, as here, has been duly entered and carried out, because of the inadvertent omission to sign it by the judge pronouncing it. He may afterwards do so nunc pro tunc, and by the statute it is given full efficacy. And there is another rule of practice, and that is that the clerk shall file and docket all orders and decrees to which the parties are entitled on default and as of course, and this practice is in accordance with the direction of, and has the sanction of, the chancellor.
Now, when an orderly foreclosure suit proceeds regularly by decree pro confesso and order of reference and master's report, as in this case, and the complainant is therefore entitled to a final decree on the report, he is entitled to it both on the default of the defendant to answer and defend, and he is also entitled to it as of course, and on the master's report. *Page 221 
The defendants, petitioners, in their brief only half-heartedly contend that the signing nunc pro tunc of the decree does not give it full force and effect from the date of its entry. In the brief on their behalf it is said:
"Complainants state that defendants seek to set up as a defense the fact that the final decree was not signed. The defendants do not pretend to set this up as a defense here. The failure to sign the decree is not a defense to this action; it could not be an answer to the bill of complaint.
"But, the defendants maintain that the failure to sign the final decree means that no final decree was made and is all the more reason for permitting an answer to be filed," citing HudsonTrust Co. v. Boyd, 80 N.J. Eq. 267, wherein the present chancellor held that decrees became effective immediately upon their being signed, without waiting for any enrollment. There was no docketed decree in that case which was unsigned, and the court was not dealing with the question here involved. Hudson TrustCo. v. Boyd does not apply. The chancellor was there endeavoring to distinguish between an enrollment in England and in this state, and said (at p. 272): "That a decree with us from the time of its being made and before enrollment has all of the force and effect that a similar decree has in England, as well after as before it is enrolled."
In Ex parte Slocomb Richards Co., 9 Ark. (4 English'sReports) 375, a motion was made to set aside a supersedeas; and the supreme court remarked (at p. 376) that it was objected against the decree that it was void in consequence of a failure of the judge to sign the proceedings as of the day on which it was rendered and entered upon the record, and remarked that the Alabama statute was precisely the same in substance as their own, and that the supreme court of that state decided that a failure of the judge to sign the final adjudging order would not invalidate the proceedings had during the term. And further (atp. 377): "The clerk is the proper custodian of the records, and to him is confided the care of making them in proper form. The courts necessarily must possess the supervising powers to examine into *Page 222 
and correct the errors which may occur. Full credence is to be given to the official acts of the clerk, yet if there should be reason to suppose that mistakes or omissions have been made in the course of completing any record, it is within the power of the proper court to rectify them, and place the record in its proper condition." The supersedeas was discharged. That the solicitors are responsible for the entry of orders and decrees and the form thereof, see Stone v. Stone, 28 N.J. Eq. 409,411; Kaufman v. Jurczak, 102 N.J. Eq. 66.
The Arkansas statute does not provide that the want of a judge's signature to a decree shall make it void; nor does ours. And I hold that when objection is made to the court that one of its decrees remains unsigned and that its judgment therefore is void, that the judge may then attach his signature to the decree, and that it then becomes valid, and that nunc pro tunc, certainly if it be so ordered, and that our statute makes all proceedings and decrees, so signed, as good and effectual in law to all intents and purposes as if the same had been duly signed by the chancellor who pronounced such final decree.
Opening a decree entered by default rests in the discretion of the chancellor, and a refusal to open such decree will not be reviewed on appeal where there is no abuse of such discretion shown, and it is not the result of mistake or imposition practiced on this court. Avidan v. Kaplan, supra.
The final decree in this case was lodged with the clerk by the solicitor of the complainants, and it was filed and docketed by him on December 12th, 1929. The complainants were entitled to it on default of the defendants to answer and also by virtue of the decree pro confesso, and they were also entitled to it as of course on the master's report. It was not immediately signed by the chancellor, but since has been. The defendants during the progress of the cause, and before sale, became aware, by their own say-so, of matter which they did not urge as a reason for opening decrees and permitting them to answer, but permitted the sale to proceed, bought the property in themselves for what they say was an *Page 223 
inadequate price (which they should not be permitted to take advantage of), and ask that the decree, pro confesso and final, be opened to permit them to answer, but do not pray that the order confirming sale be opened and the sale set aside, but, letting that stand, belatedly ask the indulgence of the court. The petitioners are confronted with a perfect record, with a signed and filed final decree, which supports their title and concludes them in every way.
The pending application is therefore denied, with costs.
 SUPPLEMENT.
In taking leave of this subject I desire to advert to the answering affidavits of the complainants and the replying affidavits of defendants, petitioners. These affidavits have largely been taken in disregard of the rules.
In re McCraven, 87 N.J. Eq. 28, this court held that the rules of evidence which do not permit of leading questions, characterizations, hearsay and conclusions, and which require that facts only may be testified to by witnesses, leaving all inferences to be suggested by way of argument and to be decided by the court, apply alike to ex parte and to litigated cases.
If this matter were tried by the examination of witnesses vivavoce, counsel could object to the illegal and irrelevant testimony and exclude it. As it is, it becomes the duty of the court to exclude it. In re McCraven, Ibid.
In the answering affidavits of the complainants the three of them make an affidavit in which, among other things of similar character, they say:
"We allege and say that any such allegations attributing any such statements to us or our agents is an absolute falsehood, made willfully and with the knowledge that it is false by the defendants, and for the purpose of delaying the suit for the deficiency commenced by us against the defendants." To have appropriately set forth facts, not conclusions, they should simply have said that, naming such and such statements, by defendants — they are untrue; and they may have *Page 224 
added, and that the truth is, c., stating only the facts from their standpoint.
Again they say:
"We aver the truth to be that such a statement is an absolute falsehood and made for the purpose," c. Now, if the statement is false it is absolutely false or deliberately false, or however you choose to characterize it, and that is a matter to be argued to the court, and the court might find it so or not.
Turning now to the replying affidavit of defendants, I call attention to the fact that William A. Weinmann, after deposing as to the intention of Max Bash in erecting a fence, said:
"I asked Mr. Bash what was the idea of erecting a fence on the land in the rear of the property in question. Mr. Bash stated that the purpose of erecting the fence was to keep vehicles and trucks off the land and that he thought it was a good idea to do it. I agreed with Mr. Bash that it was a good idea."
Whether or not it was a good idea seems to have no bearing upon the case. And according to Mr. Weinmann's statement that he agreed with Bash, he might make ten witnesses to that fact if he got Mr. Bash to declare it to that number of people. Of course such statements have no evidential value whatever.
George J. Perlman, among other things, swears:
"The statements which I have made in paragraph 6 of the previous affidavit in the above-entitled cases are absolutely true."
It is like counsel opening a case and asking the witness if the statements he made were true; which actually occurred before a justice of the peace in Mercer county many years ago.
Mr. Perlman also deposes:
"It would have been very stupid of us to purchase this building at the price we agreed to pay for it, with the knowledge that the right to go over the land to reach the said entrance depended upon the will of some third person." *Page 225 
It is evidently thought that the court cannot adjudge that fact without it being stated in the form of a conclusion.
A somewhat different view of the fence, and for what it was intended from that shown in the application, is disclosed by these affidavits. They tend to show that although it was erected, the real reason was to keep out trucks and other vehicles, and the gate therein was always open for the use of pedestrians and never has been locked.
The above statements are similar to others appearing in the affidavits on both sides.
Another thing: The solicitor of the complainant has made one of the affidavits in this matter. It speaks to the merits, and it is a matter of impropriety for him to testify at all. If he were offered as a witness in open court he would have been excluded on motion of the other side, or doubtless upon the court's own motion. See Garrett v. Garrett, 86 N.J. Eq. 293, 299, 300;Gershonowitz v. Neider, 95 N.J. Eq. 580 (at p. 581); In reJudges in Chancery, 101 N.J. Eq. 9 (at p. 11); Caruso v.Caruso, 102 N.J. Eq. 393 (at p. 401).
I pass over the affidavit of Mrs. Glantzberg. Some of its statements are evidential, some not. But it has been unnecessary to consider the testimony, wherever in agreement or conflicting, because the application to open the decrees pro confesso and final and permit the defendants to file a litigious answer, is insufficient, and therefore denied. *Page 226