MONMOUTH COUNTY CIRCUIT COURT.

IN THE MATTER OF THE APPLICATION OF THE BOND PRINTING CO., INC., TRADING AS ASBURY PARK SUN, FOR A DETERMINATION OF ITS RIGHTS, STATUS AND OTHER LEGAL RELATIONS UNDER THE STATUTES OF THIS STATE RELATING TO LEGAL ADVERTISING.

Decided July 30, 1946.

For the applicant, *Vincent P. Keuper* and *Joseph Lanigan.*

For the defendant, the New Jersey Press Association, *Morgan R. Seiffert.*

KINKEAD, C. C. J. The Bond Printing Co., Inc., trading as the Asbury Park Sun, has filed a petition for a declaratory

judgment pursuant to the provisions of *R. S.* 2:26–66, *et seq.;*
*N. J. S. A.* 2:26–66, *et seq.*, adjudging the rights, status and
legal relations of the *Asbury Park Sun* under *R. S.* 35:1–2.1
and 35:1–2.2; *N. J. S. A.* 35:1–2.1 and 35:1–2.2, as amended
by chapter 409, *Pamph. L.* 1941.

By consent of the petitioner, the New Jersey Press Asso-
ciation has been admitted as a party defendant to the pro-
ceeding for the reason that it has an interest therein, because
the newspaper publishing business is concerned and affected
by the legal question involved in this proceeding.

For many years, a newspaper known as the *Red Bank Daily*
*Standard* was published in the Borough of Red Bank, which
borough is approximately fifteen miles from the City of As-
bury Park. In the latter part of 1945, the Bond Printing
Co., Inc., was formed, and it purchased the assets of the *Red*
*Bank Daily Standard.* In the month of December, 1945,
an announcement was published in the *Red Bank Daily*
*Standard* that said newspaper would thereafter be known as
the *Asbury Park Sun.* Furthermore, pursuant to the pro-
visions of *R. S.* 35:1–3; *N. J. S. A.* 35:1–3, there was filed
and duly recorded in the office of the clerk of Monmouth
County and in the office of the Secretary of State a certificate,
whereby the name *The Red Bank Daily Standard* was changed
to that of the *Asbury Park Sun.*

The publication office of the newspaper was moved from
Red Bank to Asbury Park. For a short period of time there-
after, no newspaper was published, but finally during the
month of January, 1946, the *Asbury Park Sun* commenced
publication.

The two statutes involved in this application specify the
qualifications which are necessary to render any newspaper
eligible for state, county or municipal legal advertising. The
two statutes are practically identical, with the exception that
*R. S.* 35:1–2.1; *N. J. S. A.* 35:1–2.1, applies to state adver-
tising, and *R. S.* 35:1–2.2; *N. J. S. A.* 35:1–2.2, applies to
county and municipal advertising.

The requisites qualifying any newspaper for legal adver-
tising are substantially as follows:

1. It shall be entirely printed in the English language.

2. It shall be printed and published within the State of New Jersey.

3. It shall be a newspaper of general circulation, possessing an average news content of not less than thirty-five per centum (35%).

4. *It shall have been published continuously in the municipality where its publication office is situate for not less than two years.* (Italics supplied.)

5. It shall have been entered for two years as second class mail matter under the postal laws and regulations of the United States.

In this proceeding, we are principally concerned with the interpretation of the fourth qualification as above specified.

In December, 1945, the *Red Bank Daily Standard* had possessed for many years all of the statutory qualifications requisite for legal advertising. Furthermore, it could have changed its name to the *Asbury Park Sun* without affecting its status, if it had continued to maintain its publication office in Red Bank.

The issue, therefore, which this proceeding presents for decision is as to whether the *Standard,* after changing its name to the *Asbury Park Sun,* can also proceed to change its publication office from Red Bank to Asbury Park without affecting its statutory qualifications.

There is nothing in the respective statutes which prohibits any legally qualified newspaper from doing what the *Standard* has done in the instant case, and there is nothing therein which sanctions such a course.

There are no cases in this state, or in any other jurisdiction, which are dispositive of the issue. There are a limited number of decisions which bear remotely on the points involved. In *Lewis* v. *City of Newark,* 74 *N. J. L.* 308; 65 *Atl. Rep.* 1039, the *Newark Advertiser,* an evening paper, published a morning paper called the *Morning Star.* This latter paper had been published for only two months, whereas the legislative act required that a newspaper must be continuously published for one year in order to qualify for publication of legal notices and proceedings. It was argued that the *Advertiser* published the *Star* as a morning edition, and thus it was in

effect the same newspaper. The court held that the titles were different and that the newspapers were separate and distinct within the contemplation of the laws governing the publication of ordinances.

In *Montesano* v. *Liberty Warehouse Co.,* 121 *N. J. L.* 124; 1 *Atl. Rep.* (*2d*) 462, the *Jersey Observer* was printed in Hoboken and had its main office there. A branch office was established in Union City, to which some of the newspapers were dispatched and from there locally distributed. It was conceded that the printing was not done at the branch office, but it was also conceded that a newspaper may be published where it is not printed. The Court of Errors and Appeals held that the newspaper was not published in Union City and gave the definition that "The place of publication of a newspaper is where the paper is * * * first issued to be delivered or sent, by mail or otherwise to subscribers."

In *Bayer* v. *Mayor of Hoboken,* 44 *N. J. L.* 131, a newspaper known as the *Hoboken Advertiser* had its office in Hoboken. In addition, the entire matter for the newspaper was composed, set up and placed in forms in Hoboken, after which the forms were sent over to New York City where the press work was done. The papers were then brought back to the office in Hoboken from whence they were issued to subscribers. The Supreme Court held that the newspaper, within the reason and spirit of the law, was printed and published in Hoboken.

In construing legislation, it is the duty of the court to ascertain the legislative intent and give effect to it. Mr. Justice Heher, speaking for the Supreme Court in *Lynch* v. *Long Branch,* 111 *N. J. L.* 148 (at *p.* 151); 167 *Atl. Rep.* 664, held:

"It is an established rule in the exposition of statutes that the intention of the legislature is to be derived from a view of the whole and of every part of the statute, taken and compared together. The real intention, when ascertained, will prevail over the literal sense of terms. When words are not explicit the intention is to be collected from the context and the occasion and the necessity of the law and from the mischief felt, and the remedy in view; and the intention is to

be taken or presumed according to what is consonant to reason and good discretion. *In re Merrill,* 88 *N. J. Eq.* 261, 273; 102 *Atl. Rep.* 400."

When a newspaper has become qualified by being published continuously for two years in the same municipality, can it then move about the state and change its publication office at will without affecting its status?

I think not. I believe that a qualified newspaper retains its status only during such period as it continues to be published in the same municipality where it had acquired its statutory qualification.

A newspaper is an important factor in the life and wellbeing of the community where it is published, and the area where it circulates. It becomes identified with its domicile in a special manner because of its influence on public opinion and its power for good.

The two statutes under consideration were clearly enacted for the protection of the newspaper business as a whole, and part of the protection provided was to require a newspaper to prove its stability by publishing continuously in a municipality for at least two years before it could become eligible to derive revenue from state, county or municipal advertising.

*The Red Bank Daily Standard* had been established for a number of years in Red Bank. It was legally qualified in Red Bank. It could have retained its qualification by continuing to publish there as the *Red Bank Daily Standard.* It could have changed its name to the *Asbury Park Sun* and have retained its qualification if it had continued to be published in Red Bank. But the qualification acquired in Red Bank could not be transferred to the new publication office in Asbury Park.

The phrasing of the final paragraph of each statute is significant:

"In case a newspaper cannot meet these qualifications, itself, but has acquired another newspaper which meets these qualifications, the acquiring newspaper shall be deemed to meet these qualifications if it is published in the same municipality and entered in the same post office as was the acquired newspaper."

Thus a qualified newspaper cannot transfer its status to any purchasing or acquiring non-qualified paper, if its purchaser moves its publication office to another municipality. The publication office must remain in the same community, otherwise such a sale does not carry with it to the acquiring newspaper the qualified legal advertising status of the acquired paper.

To adopt the reasoning of the petitioner, would be to conclude that the legislative intent was to permit a qualified newspaper to move its publication office about the state at will, without loss of its qualified status, while at the same time, precluding a qualified paper from transferring its qualified status by the type of sale above outlined. I cannot concur in that reasoning, and must hold to the contrary.

There can be no question but that the ruling of the court imposes a hardship on the *Asbury Park Sun*. The qualified status which the *Red Bank Daily Standard* had acquired during its publication in Red Bank has been lost, and the *Asbury Park Sun* will be required to be published continuously in Asbury Park for a period of at least two years before it can regain that qualified status.

I can also conceive of other hardships which this legislation could impose on qualified newspapers throughout the state. For instance, a fire or other calamity could so thoroughly wipe out a newspaper plant that it would be necessary to establish a complete new set-up. It is conceivable that in some other municipality a new plant might be readily available. But the transfer of the publication office from one municipality to another would involve the loss of the newspaper's status.

Such matters, however, are the concern of the New Jersey Press Association. If they are deemed sufficiently important, I daresay that remedial legislation will be introduced by the legislature.

In fairness to the *Asbury Park Sun,* I should state that it is quite clear that this legislation was not designed for protection against such a publication as that newspaper has proven itself to be. The *Asbury Park Sun,* from its inception, has been a vigorous, virile, and interesting newspaper. Its

stability has already been established. It has made its impress on the area where it serves, and its success in the newspaper field seems to be assured.

I feel that I should state further that the New Jersey Press Association, in contesting this application, does not impugn the motives of the *Asbury Park Sun*. At the time of the hearing of this matter before the court, counsel for the defendant read into the record the following letter of the New Jersey Press Association which authorized him to appear on behalf of the Association in this proceeding:

"In opposing the petition, the Association has no ill will for the *Asbury Park Sun*, but is here because any judgment by this court would affect all newspapers and all municipalities in the state. The Association, which has supported all legislation to raise the standards of newspapers in the state, feels obligated to make every reasonable effort to sustain the laws which it has supported over the years.

"What properly constitutes a newspaper for publication of public notices involves matters of far-reaching importance. It is vital to both individual and public interests to be put on notice regarding any action, public or private, which may affect the rights of the individual, the community, or some group in the community. Because of the *quasi*-public nature of newspapers, it is vitally important that we have an adequate and proper definition of what constitutes a newspaper eligible for legal notices.

"Sometimes it is desired by those placing legal notices, both public and private, to select the least effective newspaper rather than the most effective medium for publication. Statutory definition of a newspaper helps prevent attempts to nullify the public purpose of legal notices."

While it is amply clear that the statutes in question were primarily enacted to protect established newspapers from the so-called "fly-by-night" type, it is equally clear that the legislation affects with equal force, until January, 1948, even such a robust, stable publication as the *Asbury Park Sun* has demonstrated itself to be.

I conclude that any time a newspaper seeks a declaratory judgment, adjudging it to be a qualified newspaper under

*R. S.* 35:1–2.1; *N. J. S. A.* 35:1–2.1, and *R. S.* 35:1–2.2; *N. J. S. A.* 35:1–2.2, that the court must test its qualification with respect to the fourth requisite by determining whether or not said newspaper has been published continuously in the same municipality where its publication office is presently situate for a period of not less than two years. When, as in the instant case, a newspaper fails to meet that test, the court must adjudge it a non-qualified paper, until the minimum period of two years has elapsed. The petitioner's application for a declaratory judgment is accordingly denied.